184 P.3d 1239 (2008)
2008 UT App 152
In the matter of the ADOPTION OF K.C.J., a minor.
C.J. and A.J., Petitioners and Appellants,
v.
T.C., Respondent and Appellee.
No. 20070505-CA.
Court of Appeals of Utah.
May 1, 2008.
*1240 Todd Wahlquist, Salt Lake City, for Appellants.
Suzanne Marychild, Logan, for Appellee.
Before THORNE, Associate P.J., BENCH, and BILLINGS, JJ.

OPINION
THORNE, Associate Presiding Judge:
¶ 1 C.J. and A.J. (Petitioners) bring this interlocutory appeal from the district court's order that T.C., an unmarried biological father residing outside of Utah, be given notice of any further adoption proceedings regarding the child K.C.J. Petitioners claim that even in light of an apparently valid adjudication of T.C.'s paternity of K.C.J. by an Oklahoma court, T.C. failed to strictly and timely comply with Utah's statutory requirements for unmarried biological fathers and thereby waived any right he may have had in relation to K.C.J.'s adoption proceeding. We affirm the order of the district court.

BACKGROUND[1]
¶ 2 K.M. (Mother) became pregnant with K.C.J. during a week-long visit to Oklahoma around Christmas 2005. Mother believed T.C. to be the father and, in March 2006, informed T.C. that she was pregnant. At the same time, she also informed T.C. that she was living in Utah and intended to place the baby for adoption. Mother further informed T.C. that she was going to deliver the baby in Utah and that the baby was due in September 2006. Mother spoke with T.C. several times after that and told T.C. where and how to contact her in Utah. T.C. was never married to Mother, and at no time did they ever live in the same household.
¶ 3 Mother gave birth to K.C.J. in Utah on September 8, 2006. T.C. was not listed as the father on the birth certificate. Mother relinquished her parental rights to K.C.J. on September 12, 2006, and that same day, K.C.J. was placed in the custody of LDS Social Services. LDS Social Services conducted two paternity searches with the state registrar of vital statistics at the Utah Department of Health, and the state registrar confirmed that there had been no registration of paternity rights pertaining to K.C.J. After receiving the results of the searches, also on September 12, LDS Social Services placed K.C.J. with Petitioners.
¶ 4 On September 15, 2006, T.C. filed a petition to determine K.C.J.'s paternity in the state of Oklahoma and completed a Notice of Commencement of Paternity Proceedings for filing with the state registrar of vital statistics at the Utah Department of Health. The Utah state registrar accepted T.C.'s notice on September 18, 2006. On October 17, 2006, Petitioners filed a Verified Petition for Adoption in Utah district court, alleging that K.C.J.'s biological father had failed to "register any paternity rights as required by Utah law."
¶ 5 At the adoption finalization hearing on March 14, 2007, the district court declined to hear the petition for adoption because of the pending paternity action in Oklahoma. On April 30, 2007, an Oklahoma court issued an order establishing that T.C. was the biological father of K.C.J. (the Oklahoma order). Shortly thereafter, the Oklahoma court dismissed T.C.'s petition regarding child custody, citing a lack of jurisdiction.
*1241 ¶ 6 On June 12, 2007, the Utah district court ruled that T.C. was entitled to notice before any further proceedings could be held with respect to K.C.J.'s adoption. The district court concluded that T.C. "must be treated in a manner consistent with the Oklahoma [order] as an unmarried biological father of [K.C.J.] and provided notice of any further adoption proceedings." Upon Petitioners' request for reconsideration of this ruling, the district court clarified that T.C. was being allowed notice to address the "conflicts of laws question presented when it appears that [T.C.] has complied with the law of Oklahoma rather than the law of Utah." Petitioners then sought permission to bring this interlocutory appeal, which this court granted.

ISSUE AND STANDARD OF REVIEW
¶ 7 Petitioners claim that the district court erred in ruling that T.C. was entitled to notice of any further adoption proceedings. Petitioners argue that despite the existence of the Oklahoma order, T.C.'s failure to strictly and timely comply with Utah's statutory requirements for unmarried biological fathers constitutes a waiver of any right he may have had to notice of K.C.J.'s adoption. The district court's order and Petitioners' challenge thereto present questions of standing and intervention. See generally In re E.H., 2006 UT 36, 137 P.3d 809 (analyzing a mother's right to intervene in adoption proceedings after relinquishing parental rights). We review such questions for correctness, applying minimal deference to a district court's application of the law to the facts. See Jones v. Barlow, 2007 UT 20, ¶ 10, 154 P.3d 808 ("Determinations of the legal requirements for standing are reviewed for correctness. However, we give deference to the district court on factual determinations that bear upon the question of standing. Finally, we give minimal discretion to the district court in its application of the facts to the law." (citations omitted)); cf. In re Marriage of Gonzalez, 2000 UT 28, ¶ 16, 1 P.3d 1074 (adopting de novo standard of review for questions of intervention as of right under Utah Rule of Civil Procedure 24(a)).

ANALYSIS
¶ 8 T.C. may ultimately be deemed to have waived any rights he may have to object to K.C.J.'s adoption. However, whether or not he has waived those rights is, at this stage of the proceeding, a matter of dispute that requires adjudication. Until the district court has an opportunity to examine both the factual presentation and legal arguments involved in an adjudication of T.C.'s substantive rights, T.C. has the procedural right to participate in "`the adversarial process that our system counts on to produce just results.'" See State v. King, 2006 UT App 355, ¶ 16, 144 P.3d 222 (citation omitted), cert. granted, 153 P.3d 185 (Utah 2007). Accordingly, we affirm the district court's order allowing T.C.'s limited participation in this matter.
¶ 9 We first note that, despite the characterizations of both the parties and the district court, this case does not present a "notice of adoption proceedings" question under Utah Code section 78-30-4.13. See Utah Code Ann. § 78-30-4.13 (Supp.2006).[2] The notice that section 78-30-4.13 refers to is akin to service of process under the Utah Rules of Civil Procedure. See id. § 78-30-4.13(2) ("Notice of an adoption proceeding shall be served on each of the following persons. . . ." (emphasis added)); Utah R. Civ. P. 3, 4 (governing commencement of civil actions and service of process as required for the initiation of an action). In other words, section 78-30-4.13 governs who must be affirmatively sought out and notified of the impending action such that the action may properly proceed.
*1242 ¶ 10 This case presents a different question here, T.C. is already aware of the proceeding and has presented himself to the court, seeking to be allowed to establish his right to contest K.C.J.'s adoption.[3] Clearly, Utah Code section 78-30-4.13 does not require the parties to an adoption proceeding to search out and identify fathers in T.C.'s position. However, where, as here, the district court becomes aware of a putative father's interest and desire to participate in the proceeding, the question becomes whether the father has standing to intervene in the proceeding. Under the circumstances of this case, the district court properly allowed T.C. to participate in the action for purposes of litigating the effect of the Oklahoma order.
¶ 11 "[T]he presence or absence of parental rights does not determine whether a person has standing to intervene in an adoption proceeding." In re E.H., 2006 UT 36, ¶ 50, 137 P.3d 809. Rather, what is required is a person's "direct interest in the subject matter of the litigation such that [his or her] rights may be affected, for good or for ill," id. ¶ 51, and this interest may arise from the intervenor's status or circumstances, see id. Here, T.C. filed his paternity petition in Oklahoma court one week after K.C.J.'s birth[4] and obtained a paternity order prior to a finalization of K.C.J.'s adoption. Petitioners' adoption action seeks to cut off whatever parental rights the Oklahoma order may have granted or recognized as belonging to T.C. Thus, T.C. has a "protectable interest in the litigation," see Gedo v. Rose, 2007 UT App 154, ¶ 7, 163 P.3d 659, cert. denied, 168 P.3d 1264 (Utah 2007), and is entitled to have his right to further participation adjudicated after presenting relevant evidence and legal arguments in support of his claims, see id. ¶¶ 7-8 (mandating the allowance of a parent's participation in a proceeding intended to cut off parental rights); see also Utah R. Civ. P. 19(a) (stating that, absent jurisdictional problems, a trial court "shall order" the joinder of persons with a protectable interest in litigation). Thus, the district court's order requiring notice to T.C. in order for him to be allowed to litigate the effect of the Oklahoma order was entirely proper.[5]
¶ 12 In so holding, we are aware of the longstanding general rule that an unwed biological father must comply with Utah law to perfect his parental rights unless he can show that it was impossible for him to do so through no fault of his own. See Wells v. Children's Aid Soc'y, 681 P.2d 199, 207-08 (Utah 1984). We are also aware of the multiple Utah cases extinguishing the rights of unwed fathers for failure to strictly comply with Utah law, sometimes on very minor issues of noncompliance. See, e.g., Sanchez v. L.D.S. Soc. Servs., 680 P.2d 753, 755 (Utah 1984) ("It is of no constitutional importance that [the father] came close to complying with the statute."); Beltran v. Allan, 926 P.2d 892, 896 (Utah Ct.App.1996) ("[T]he statutes demand strict compliance with the notice of paternity requirement and not even substantial compliance will suffice."). Here, however, T.C. has actually obtained a court order from a sister state establishing his paternity of K.C.J. As recognized by the district court, the existence of the Oklahoma order potentially creates a conflict with Utah law and T.C. must be allowed to argue for the resolution of that conflict in his favor.
¶ 13 We are also mindful of the various constitutional problems that could arise were T.C. to be denied an opportunity to argue the effect of the Oklahoma order before the district court. The most obvious of these infirmities would be the potential *1243 denial of T.C.'s procedural due process rights. "The fundamental requirement of due process is the opportunity to be heard `at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). As Wells v. Children's Aid Society, 681 P.2d 199 (Utah 1984), makes clear, due process is not violated every time an unwed father's child is adopted without giving him notice or an opportunity to contest the adoption. See id. at 207 ("Due process does not require that the father of an illegitimate child be identified and personally notified before his parental right can be terminated."). Nevertheless, in the circumstances of this case, T.C. has obtained whatever rights inure in the Oklahoma order and must be allowed to defend those rights if they are to be terminated by a Utah court.
¶ 14 Any violation of T.C.'s procedural due process rights in this case would be particularly acute in light of the number of constitutional issues of first impression potentially presented by the conflict between the Oklahoma order and Utah statute. First and foremost of these would be the implication of the United States Constitution's Full Faith and Credit Clause. See U.S. Const. art. IV, § 1 ("Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."). T.C. may also possess substantive due process rights in these circumstances that could be violated if he were to be excluded from this proceeding. See Wells, 681 P.2d at 204 ("Substantive due process concerns the content of the rules specifying when a right can be lost or impaired." (emphasis omitted)); see also Lehr v. Robertson, 463 U.S. 248, 262-63, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (applying due process analysis to the protection of an unwed father's "opportunity to form [a parent-child] relationship"); Thurnwald v. A.E., 2007 UT 38, ¶ 28, 163 P.3d 623 (stating that a father's "opportunity interest in developing a relationship with his newborn [is] a `provisional right' that is itself protected by the due process clause of the Utah Constitution" (citation omitted)). The Utah Constitution also contains an open courts provision that could potentially bear on the proper result in this case. See Utah Const. art. I, § 11 ("All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.").
¶ 15 Further, as much as this case is about T.C.'s right to be a parent to K.C.J., K.C.J. also has an interest in, and arguably even a right to, a parent-child relationship with T.C. See Utah Code Ann. § 78-30-1.5(1) (2002) ("It is the intent and desire of the Legislature that in every adoption the best interest of the child should govern and be of foremost concern in the court's determination."); Lehr, 463 U.S. at 258, 103 S.Ct. 2985 (noting the Court's prior concern with the rights of the children born out of wedlock); see also Trimble v. Gordon, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) (addressing child's inheritance rights); Jimenez v. Weinberger, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974) (addressing social security benefits for child); Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (addressing worker compensation benefits payable to child). Termination of T.C.'s parental rights, such as they may be, will have numerous effects on K.C.J., not all of them positive. Not only does K.C.J. face the removal of a biological parent from her life, but she will also be denied such diverse benefits as inheritance rights and access to genetic information. Denying K.C.J. a relationship with her biological father, with all of the consequences that such denial will entail, should take place only upon the district court's appraisal of all potentially relevant legal and factual considerations. Without T.C.'s participation in at least the initial stages of this proceeding, that cannot properly happen.
¶ 16 We refrain from speculating on the substance or merits of these or other constitutional arguments but note that T.C.'s successful procurement of a paternity declaration shortly after K.C.J.'s birth makes this a *1244 more difficult case than most. While the Utah Supreme Court has repeatedly upheld the short post-birth window that Utah law provides to unwed fathers in order to claim their rights, that court has also recognized that the United States Supreme Court has not "determined the rights of an unwed father of a newborn child or considered whether the United States Constitution places additional restrictions on the laws a state may enact to terminate unwed fathers' opportunities to assert their rights to newborns." Thurnwald, 2007 UT 38, ¶ 27, 163 P.3d 623 (emphasis added). Indeed, the case underlying our entire jurisprudence on this issue, Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), addressed only the situation of an unwed father who waited over two years from the child's birth to assert his legal interest. See Thurnwald, 2007 UT 38, ¶ 26, 163 P.3d 623; see also Lehr, 463 U.S. at 250, 103 S.Ct. 2985. T.C. waited just one week, a delay that apparently did not preclude the exercise of his paternity rights under Oklahoma law. If nothing else, the potential for T.C. to make constitutional arguments under these facts would render any denial of his procedural due process rights even more problematic.
¶ 17 Although we affirm the district court's order allowing notice to T.C., we are not unaware of the problems that T.C. will likely face in attempting to establish that his consent or relinquishment is required before Petitioners may adopt K.C.J. As a matter of Utah statutory law this question is governed by Utah Code section 78-30-4.14, see Utah Code Ann. § 78-30-4.14 (Supp.2006), and we have previously acknowledged that statute's harsh results for unwed fathers who delay in asserting their legal interests, see, e.g., Pearson v. Pearson, 2006 UT App 128, ¶ 34, 134 P.3d 173 ("A father who fails to comply with the requirements of section 78-30-4.14(2) has no standing to object to [an] adoption and permanently loses his parental rights to the child."), aff'd, 2008 UT 24. In this case however, T.C. apparently complied with the law of a sister sovereign, Oklahoma, where he resided and where it is claimed the child was conceived. More than any other factor in this case, it is this valid sister-state order that persuades us that the district court properly ordered that T.C. be allowed his day in court. Once the district court has heard both sides' factual and legal arguments, it will make a ruling and the case will proceed with T.C.'s rights established or disestablished as the case may be.

CONCLUSION
¶ 18 T.C. acted promptlywithin a week of K.C.J.'s birthto obtain the Oklahoma order establishing his biological parentage of K.C.J. Although, based solely on the facts presented by Petitioners, T.C. may have failed to comply with Utah law governing unmarried biological fathers, he apparently acted within the laws of the state of Oklahoma. The district court correctly found that T.C. has an interest in K.C.J.'s adoption proceeding, at least to the extent of addressing the conflict between the Oklahoma order and Utah law.
¶ 19 The dissenting opinion presents a compelling legal argument for a resolution of the merits of this case in favor of the Petitioners. However, the ultimate question of K.C.J.'s future is not the question presented on appeal. Rather, the question on appeal is whether T.C. is to be allowed to present his own, possibly equally compelling, legal and factual arguments to the district court. On this narrow question, we agree with the district court that T.C. is entitled to an opportunity to attempt to identify and defend whatever parental rights he may have obtained under Oklahoma law. Accordingly, we see no error in the district court's order allowing T.C.'s de facto intervention in this matter to litigate the existence of his parental interest in K.C.J.indeed, fundamental fairness demands no less. We therefore affirm the district court's order and remand this matter for further proceedings.
¶ 20 I CONCUR: JUDITH M. BILLINGS, Judge.
BENCH, Judge (dissenting):
¶ 21 In reaching their decision, my colleagues ignore over two decades of Utah precedent that interprets Utah's adoption statutes and addresses due process requirements relating to the rights of putative fathers. *1245 According to controlling precedent, T.C.'s standing to contest K.C.J.'s adoption is directly tied to whether he has waived his rights to notice and consent by failing to comply with Utah's statutes. In light of the plain language of our statutes and binding Utah precedent interpreting these statutes, T.C.'s waiver is not a matter of dispute. Furthermore, due process does not require that T.C. receive a hearing to put forth evidence or to argue the applicability of Oklahoma law because T.C. has not made any showing that it was impossible for him to comply with Utah law. Finally, any possible compliance with Oklahoma law is immaterial given that Utah law indisputably applies to K.C.J.'s adoption proceedings.

I.T.C. Has No Standing to Contest K.C.J.'s Adoption
¶ 22 The majority erroneously recasts the issue in this appeal as a general one of standing and intervention based on unspecified interests rather than one of standing based on parental rights preserved by strict statutory compliance. Contrary to the majority's conclusion, the ultimate issue in this appeal is whether T.C. waived his rights to notice of and consent to K.C.J.'s adoption and lost his standing to object to K.C.J.'s adoption by failing to timely comply with the requirements of Utah statutes. A putative father's standing to intervene or otherwise contest an adoption is directly tied to whether he has waived or forfeited his rights to notice and consent by failing to comply with Utah's statutes. See In re Adoption of Connor, 2007 UT 33, ¶ 8, 158 P.3d 1097 ("In order to have standing to contest the adoption, [the putative father] was required to establish that he had [complied with relevant portions of Utah's adoption statutes]." (citing Utah Code Ann. § 78-30-4.14(4)(a)(i)-(iii) (Supp.2006))); In re Adoption of B.B.D., 1999 UT 70, ¶ 8, 984 P.2d 967 (affirming a district court's ruling that because the unmarried biological father "failed to follow Utah's statutory scheme for establishing paternity, he had no legal standing to contest the child's adoption").
¶ 23 In fact, "[t]he first sentence of Utah Code section 78-30-4.16(1) directs a court presiding over a contested adoption to make a threshold inquiry into statutory compliance," specifically, "statutory compliance [regarding] `a party['s] entitle[ment] to notice and consent.'" In re E.H., 2006 UT 36, ¶ 46, 137 P.3d 809 (quoting Utah Code Ann. § 78-30-4.16(1) (2000)). Whether an unmarried biological father has preserved his rights to notice and consent depends entirely on his compliance with Utah Code sections 78-30-4.13[1] and 78-30-4.14,[2] including the deadlines set forth therein. See Utah Code Ann. § 78-45g-403 (Supp.2006) (providing that although "[n]otice of an adoption proceeding shall be given to unmarried biological fathers," such notice is only required in circumstances outlined in Utah Code "[s]ection 78-30-4.13"); Utah Code Ann. § 78-30-4.13(2)(a)-(b) (Supp.2006) (listing persons to whom notice of an adoption must be given as including unmarried biological fathers and persons "whose consent or relinquishment is required under [s]ection 78-30-4.14"). According to the statutory deadlines, a putative father must take certain actionsmost notably, filing a petition for paternity and notice of that action with the Utah Department of Healthprior to the time the mother relinquishes the child for adoption. See Utah Code Ann. § 78-30-4.13(3)(d)(ii)(B) (setting *1246 the date of the mother's relinquishment as the deadline for taking actions necessary to preserve a right to notice); see also id. §§ 78-30-4.14(1)(d), (6) (setting the date of the mother's relinquishment as the deadline for taking actions necessary to preserve a right to consent). These deadlines can only be extended after the fact when, prior to the mother's relinquishment, a putative father did not know, or could not have known, that the mother was pregnant, that she was living in Utah, that the baby would be born in Utah, or that the mother intended to place the child for adoption in Utah. See id. § 78-30-4.14(10)(a)-(b).
¶ 24 Where there is no justification for extending the deadlines, the consequence for failure to timely comply with Utah's adoption statutes is abundantly clear. If an unmarried biological father fails to

fully and strictly comply with the requirements of [Utah law, he] is considered to have waived and surrendered any right in relation to the child, including the right to . . . notice of any judicial proceeding in connection with the adoption of the child[] and . . . [the right to] consent, or refuse to consent, to the adoption of the child.
Id. § 78-30-4.14(11) (emphases added). This waiver occurs because a putative father's interest in a child is merely "inchoate," id. § 78-30-4.12(2)(e), and does not become actualized until he "timely exercise[s] it[] or . . . strictly compl[ies] with the available legal steps to substantiate it," id. § 78-30-4.12(3)(b). As recognized even by the majority, "substantial compliance with [Utah's adoption] statute is not enough" to preserve these rights. In re Adoption of W., 904 P.2d 1113, 1121 (Utah Ct.App.1995). In fact, "[b]ecause of the nature of the subject matter dealt with by the statute," Utah courts have concluded that "a firm cutoff date [for those rights] is reasonable, if not essential." Sanchez v. L.D.S. Soc. Servs., 680 P.2d 753, 755 (Utah 1984).
¶ 25 The majority cites In re E.H., 2006 UT 36, 137 P.3d 809, for the proposition that a person may have standing to intervene in an adoption proceeding even absent these parental rights to notice and consent. The Utah Supreme Court's holding in In re E.H. is much narrower than the majority represents. In In re E.H., the supreme court held that where a person "has made the requisite showing for intervention under rule 24(a) [of the Utah Rules of Civil Procedure]," id. ¶ 57, that person may be "eligible to intervene and present relevant best interests evidence" at the section 78-30-9 adoption hearing, id. ¶ 55, which hearing is limited to the exclusive issue of whether the adoption to particular parents is in the child's best interests, see id. ¶ 58. Thus, the In re E.H. decision allowed a biological mother, whose parental rights had been waived, to present evidence of the child's bests interests at the section 78-30-9 adoption hearing because she had made a showing of interest based on factors other than the preservation of her parental rights to notice and consent. See id. ¶ 57 (concluding that the biological mother could participate in a best interests hearing because she had, among other things, "actively participated in the selection of the adoptive parents[,] . . . lived in the adoptive parents' home and observed the environment and family dynamics," and "consented to a stipulation [with the adoptive parents] directed exclusively to advancing the best interests of [the child]"). These interests, however, did not grant her standing to contest the adoption. See id. ¶ 58 ("We reiterate that the hearing in which the mother is entitled to participate is . . . the section 78-30-9 adoption hearing."); cf. In re Adoption of B.B.D., 1999 UT 70, ¶ 28, 984 P.2d 967 ("[B]y failing to [follow Utah's statutory scheme for] establish[ing] his paternity, [the unmarried biological father] lost any parental rights he may have had. Therefore, he had no right to contest the adoption, nor did he have any right to an evidentiary hearing to determine whether the adoption was in the best interest of the child.").
¶ 26 In this case, it is undisputed that T.C. failed to meet the deadlines imposed by Utah's statutes. While he ultimately did initiate a paternity action and file notice of the same with the Utah Department of Health, he did so only after Mother had relinquished the child for adoption. There is no excuse for this failure because he undisputedly knew all of the material information regarding *1247 Mother's pregnancy, location, and intentions to place the child for adoption several months before K.C.J.'s birth. As a result, T.C. has no standing to contest K.C.J.'s adoption.
¶ 27 The district court erred, therefore, by ruling that T.C. had a right to notice of any further proceedings regarding K.C.J.'s adoption. By failing to timely take the steps outlined in Utah law to preserve his parental rights, T.C. "has placed himself in the position where Utah courts cannot recognize him as an interested individual with rights to challenge an adoption proceeding." Osborne v. Adoption Ctr. of Choice, 2003 UT 15, ¶ 34, 70 P.3d 58. T.C.'s status as an out-of-state father does not exempt him from those requirements. In fact, the Utah Supreme Court has affirmed the denial of an out-of-state unmarried biological father's petition to intervene in an adoptiondespite the father's filing of a paternity and custody action in his state of residencebecause the father had taken "no legal action in his home state . . . prior to the mother's relinquishment," the deadline imposed by Utah law. Id. ¶ 17. As stated by the Utah Supreme Court in Osborne v. Adoption Center of Choice, 2003 UT 15, 70 P.3d 58:
If we decided to allow every out-of-state putative father to contest an adoption without making some demonstration to a Utah court that he preserved his parental rights, we would open the gate for any out-of-state person to claim he is the putative father and to interrupt a Utah adoption proceeding by simply alleging that he is the biological father and that Utah law does not apply to him. We should not halt adoptions on the mere allegation of biological fatherhood.
Id. ¶ 35.
¶ 28 Here, the trial court refused to hear the petition to finalize the adoption on March 14, 2007, because of the pending paternity action. The Oklahoma paternity order was not issued until a month and a half later, on April 30, 2007. The trial court therefore did exactly what the supreme court forbade: It sua sponte halted the finalization of K.C.J.'s adoption on T.C.'s allegation of biological fatherhood before an adjudication of his paternity was actually made and without a demonstration that T.C. had preserved his parental rights. The majority erroneously condones this error.

II. Due Process Does Not Entitle T.C. to a Hearing
¶ 29 Contrary to the impression left by the majority's cursory treatment of Utah case law, this is not the first time that Utah courts have considered the due process rights of putative fathers who attempt to assert parental rights despite their failure to timely comply with Utah's statutes. Under Utah precedent, due process does not entitle a putative father to a hearing to assess his preservation of parental rights unless the father has "first shown that it was `impossible' for [him] to [comply with Utah's adoption statutes, including the deadlines for filing contained therein], `through no fault of his own.'" Wells v. Children's Aid Soc'y, 681 P.2d 199, 208 (Utah 1984). In fact, Utah courts have mandated a hearing, such as the one contemplated by the majority, only where the father asserts that it was impossible for him to comply with Utah statutes because he did not know and could not have known certain material facts: that the mother was pregnant, that she was living in Utah, or that she intended to place the child for adoption in Utah. See Ellis v. Social Servs. Dep't of the Church of Jesus Christ of Latter-Day Saints, 615 P.2d 1250, 1256 (Utah 1980) (holding that due process required a hearing so the putative father would have an "opportunity to present evidence to show as a factual matter that he could not reasonably" have complied with Utah's statutory requirements or deadlines because "he could not reasonably have expected his baby to be born in Utah"); see also Beltran v. Allan, 926 P.2d 892, 895-96 (Utah Ct.App.1996) (defining material facts as being whether the putative father "knew of the pregnancy and that the mother was in Utah to place the child for adoption"). However, where there is no indication that the putative father was "misled" as to these material facts or otherwise "prevented from" complying with Utah's adoption statutes "by filing a notice of paternity," the application of Utah's statute to effect a waiver of his parental rights does not violate due process. *1248 Swayne v. L.D.S. Soc. Servs., 795 P.2d 637, 642-43 (Utah 1990).
¶ 30 Thus, under Utah law, an unmarried biological father carries the burden to come forward with some evidence demonstrating that he should be excused from his failure to comply with Utah's statutes. There is simply no general due process requirement that a "putative father's diligence to establish his parental rights . . . be individually assessed." Beltran, 926 P.2d at 897. A hearing such as the one contemplated by the majority here is dependent upon the father's initial demonstration that there is some reason to hold one. If the father fails to meet this burden, due process does not obligate Utah courts to bend over backwards to provide him with additional opportunities to do so. See Wells, 681 P.2d at 208 (explaining that evidentiary hearings are required only where the putative father makes a showing of impossibility because "the need to prove in each adoption case that the unwed father . . . had a `reasonable opportunity' to file the required notice of paternity would frustrate the statute's purpose to facilitate secure adoptions by early clarification of status").
¶ 31 In this case, T.C. failed to comply with Utah's statutory requirements for putative fathers, and T.C. has not asserted that it was impossible for him to comply with those requirements. It is undisputed that T.C. failed to file his petition for paternity and notice thereof before the statutory deadlinethe day Mother relinquished the child for adoption. Mother's affidavit amply demonstrates that it was possible for T.C. to comply with the statutory requirements. Despite the majority's squeamishness regarding this uncontested affidavit, it is sworn testimony and it includes statements that T.C. had knowledge of the material facts: Mother was pregnant, Mother was living in Utah, and Mother intended to place the baby for adoption. Although the majority speaks as if T.C. was never "allowed" to present his version of the story, the fact of the matter is that T.C. has never even claimed a different version of the facts or otherwise attempted to refute any of the statements in Mother's affidavit.[3] Even more telling is that T.C.'s recitation of the facts in his brief on appeal mirrors Petitioners' recitation. T.C.'s utter failure to make any showing that he did not know or could not have known of the material facts disqualifies him from any right to the hearing contemplated by the majority.

III. The Oklahoma Order Does Not Alter T.C.'s Rights
¶ 32 Oklahoma's belated adjudication of T.C.'s paternity does not, as the majority claims, "make[] this a more difficult case than most." The majority improperly inflates the significance and legal effect of the Oklahoma order. The Oklahoma order merely declared what Mother and Petitioners had already presumed: that T.C. was the biological father of K.C.J. The Oklahoma order does not establish that T.C. has preserved his parental rights under Oklahoma law or has a legally recognized relationship with K.C.J. In fact, T.C. "has made no attempt to show that he has complied with the legal requirements of [Utah] or of any other state in order to establish a legally recognized relationship with the child whose adoption he intends to interrupt." Osborne v. Adoption Ctr. of Choice, 2003 UT 15, ¶ 34, 70 P.3d 58 (emphasis added). T.C. has not cited a single Oklahoma statute or case that demonstrates that his parental rights have been preserved under Oklahoma law by virtue of the Oklahoma order. In short, T.C. has failed to demonstrate any conflict between Utah and Oklahoma law.
¶ 33 Furthermore, the majority ignores the fact that any compliance with Oklahoma law is immaterial given that Utah has the most significant relationship to the adoption proceedings and the fact that Utah law, rather than Oklahoma law, applies. See Waddoups v. Amalgamated Sugar Co., 2002 UT 69, ¶ 14, 54 P.3d 1054 ("In Utah we apply the `most significant relationship' approach as described in the Restatement (Second) of Conflict of Laws in determining which state's law should apply to a given circumstance."). *1249 Where the nature of a given claim involves a status adjudication, "the state where the child resides is a highly significant factor" in determining the applicability of a given state's law. In re S.O., 2005 UT App 393, ¶ 7, 122 P.3d 686 (mem.) (per curiam). Other relevant factors include whether "facts pertaining to . . . [the] potential adoptive parents are readily available" in one state instead of another and whether another state has "declined jurisdiction over the child custody proceeding." Id. With respect to adoption proceedingsa specific type of status adjudicationthe Restatement (Second) Conflict of Laws states that "[a] court applies its own local law in determining whether to grant an adoption." Restatement (Second) Conflict of Laws § 289 (1971). Here, the residence of K.C.J., the biological mother, and the adoptive parents, as well as Oklahoma's refusal to assert jurisdiction over child custody proceedings, all demonstrate that Utah has a more significant relationship with the child and that Utah law applies.
¶ 34 Even if full faith and credit were given to Oklahoma's adjudication of T.C.'s biological fatherhood, T.C. would not be able to escape the deadlines imposed by Utah law. Utah law recognizes an adjudicated biological father's right to consent or refuse to consent to an adoption, but it does so only where the adjudication of paternity occurred "prior to the mother's execution of consent to adoption or her relinquishment of the child for adoption." Utah Code Ann. § 78-30-4.14(1)(d) (Supp.2006) (emphasis added). T.C. did not file for or obtain Oklahoma's adjudication of paternity until after Mother's relinquishment of K.C.J. Additionally, there is no indication in the record that T.C. filed an affidavit setting forth his ability and plan to care for K.C.J. or made any offers to pay for expenses incurred in connection with K.C.J.'s birth. See id. § 78-30-4.14(6)(a)-(d) (listing the actions an unmarried biological father must take to preserve his right to consent where he does not obtain an adjudication of paternity prior to the mother's relinquishment of the child for adoption). Mother's relinquishment therefore constituted the cutoff date for T.C.'s "right in relation to the child." Id. § 78-30-4.14(11).
¶ 35 The majority erroneously overlooks T.C.'s failure to comply with Utah statutes, his failure to offer any justification for his lack of compliance, and his waiver of rights to notice and consent that resulted therefrom. There is absolutely no justification under Utah law for compromising this child's stable home by affording T.C. the second-chance hearing contemplated by the majority. I therefore respectfully dissent.
NOTES
[1] The district court made no factual findings below, and we take the facts largely from the verified petition and materials, including Mother's affidavit that Petitioners provided in support of their opposition to T.C.'s involvement in the case. We note that T.C. has not yet been allowed to introduce factual evidence and that such evidence could potentially conflict with these sources.
[2] We refer to the statutory provisions in effect at the time the adoption petition was filed, although the Utah Adoption Act has since been recodified. See Utah Code §§ 78B-6-101 to -145 (2008). We also note that the district court did not rely directly on Utah Code section 78-30-4.13, but rather on section 78-45g-403, which incorporates section 78-30-4.13 by reference. See Utah Code Ann. § 78-45g-403 (Supp.2006) ("Notice of an adoption proceeding shall be given to unmarried biological fathers pursuant to Section 78-30-4.13.") (recodified as Utah Code § 78B-15-403 (2008)).
[3] T.C. did not formally file a motion to intervene in this proceeding in the district court. Although the record is sparse, it appears that the district court's request for briefing and its ultimate notification order were undertaken sua sponte upon becoming aware of T.C.'s Oklahoma paternity action. If T.C.'s failure to file a motion to intervene is of any import, Petitioners have not alleged as much in their appellate brief. We also note that T.C. entered an appearance through counsel before this court and participated in the appellate briefing and oral argument.
[4] The record does not indicate when T.C. received notice of K.C.J.'s birth, but his petition in Oklahoma court indicates an awareness that K.C.J. had been born on September 8, 2006.
[5] Given the lack of a motion to intervene by T.C., we express no opinion on whether the district court would have erred had it failed to act sua sponte in this matter.
[1] Utah Code section 78-30-4.13 provides that "[i]n order to preserve any right to notice and consent, an unmarried biological father may . . . [1] initiate proceedings to establish paternity . . . and . . . [2] file a notice of the initiation proceedings . . . with the state registrar of vital statistics within the [Utah] Department of Health." Utah Code Ann. § 78-30-4.13(3)(a)(i)-(ii) (Supp.2006). He must do these things "prior to the mother's . . . relinquishment of the child for adoption." Id. § 78-30-4.13(3)(d)(ii)(B) (emphasis added).
[2] Utah Code section 78-30-4.14 specifies that in order to preserve the right to consent or refuse to consent to an adoption, an unmarried biological father must receive an adjudication of paternity "prior to the mother's execution of consent to adoption or her relinquishment of the child for adoption." Id. § 78-30-4.14(1)(d) (emphasis added). Alternatively, he must initiate a paternity proceeding, file an affidavit regarding his ability to care for the child, file a notice of the paternity proceeding, and offer to pay expenses "prior to the time the mother executes her consent for adoption or relinquishes the child for adoption." Id. § 78-30-4.14(6) (emphasis added).
[3] T.C. has never filed a motion to intervene in the adoption proceeding, never filed his own affidavit, and never even alleged in any sort of pleading before the district court or this court that Mother's statements were anything other than accurate.