220 P.3d 464 (2009)
2009 UT 70
In the Matter of the Adoption of I.K., a minor child.
J.S., Appellant,
v.
P.K. and J.K., Appellees.
No. 20080554.
Supreme Court of Utah.
October 27, 2009.
*465 Clark R. Nielsen, Kathryn J. Steffey, Salt Lake City, for appellant.
Larry S. Jenkins, Richard J. Armstrong, Lance D. Rich, Salt Lake City, for appellees.

On Certification from the Utah Court of Appeals.

INTRODUCTION
WILKINS, Justice:
¶ 1 In this direct appeal, Appellant J.S. seeks to challenge the adoption of I.K., his alleged daughter. We are asked to determine (1) whether Utah's adoption statute, specifically Utah Code sections 78B-6-120 to -122,[1] violates J.S.'s due process rights as applied; (2) whether it was error for the district court, finding that J.S. did not comply with New Mexico law, to deny his motion to dismiss; and (3) whether the district court erred in determining that J.S. lacked standing to challenge the adoption. We hold that regardless of whether sections 78B-6-120 to -122 would violate due process as applied to J.S., the question is moot because he failed to meet the requirements of New Mexico law. Accordingly, the district court did not err by denying his motion to dismiss nor by *466 determining that he lacked standing. As a result, we affirm the district court.

BACKGROUND
¶ 2 In January and February of 2007, J.S. (the Natural Father) and T.C. (the Birth Mother), residents of New Mexico, engaged in a physically intimate relationship, resulting in the pregnancy of the Birth Mother. Though the couple ended their relationship in February 2007, the Birth Mother contacted the Natural Father in March 2007 to inform him that she was pregnant and intended to have an abortion. The Natural Father objected to the abortion, but agreed to drive the Birth Mother to the abortion clinic. Once at the clinic, personnel allegedly informed the Birth Mother that she could not undergo the procedure due to problems with her medical records. The Birth Mother told the Natural Father that she would have someone else drive her when she returned to have the abortion and that she did not want the Natural Father to be further involved. However, without informing the Natural Father, the Birth Mother did not have an abortion and gave birth to Baby Girl C (now named and referred to as I.K.) in October 2007. Though a permanent resident of New Mexico, the Birth Mother delivered the baby in Colorado, a state with which the Birth Mother had no connections.
¶ 3 On November 11, 2007, without informing the Natural Father, the Birth Mother consented to adoption and relinquished the baby to Act of Love, a Utah adoption agency. The Birth Mother did not have any other contacts with the State of Utah. Act of Love placed I.K. with Utah adoptive parents, P.K. and J.K. (the Adoptive Parents), who filed a petition for adoption in Utah on November 13, 2007.
¶ 4 The Natural Father first received notice of I.K.'s birth on November 4, 2007, when he was contacted by Family Matters, a New Mexico adoption agency. The Natural Father refused to consent to the adoption of I.K. and contacted an attorney to protect his parental rights. Shortly after refusing consent to Family Matters, the Natural Father received a phone call from the Birth Mother, during which she asserted her determination to place I.K. for adoption. The Natural Father continued to object. Through his attorney, the Natural Father filed a petition to establish paternity and custody in New Mexico on November 20, 2007. The Natural Father also offered to provide financial support for I.K. in December 2007, which the Birth Mother refused. However, at no time did he file with the New Mexico Putative Father Registry.[2]
¶ 5 Unaware of the pending Utah adoption case, the Natural Father continued his paternity case in New Mexico. Only just before an emergency custody hearing on January 23, 2008 did he learn that the baby had been placed for adoption in Utah. Nevertheless, proceeding with his case, on February 12, 2008, the New Mexico court found the Natural Father to be the father of I.K. and awarded him temporary custody during the paternity action.
¶ 6 One week earlier, on February 6, 2008, Act of Love filed a Verified Petition to Determine Birth Father's Rights (Birth Father Petition) in Utah as a separate action from the adoption case. On February 26, 2008, the Natural Father filed, in Utah, a Verified Motion to Dismiss Adoption that requested custody and a Motion to Transfer and Consolidate the Birth Father Petition with the adoption case. The district court consolidated the cases, but on April 30, 2008, after hearing oral argument, denied the motion to dismiss the pending adoption. The district court found that the Natural Father had failed to "establish his legal rights in either Colorado, New Mexico or Utah before the birth mother executed her relinquishment" and had not offered any evidence "why he failed to do so or why it was somehow impossible for him to do so." The court also found that the Natural Father failed to file notice with the New Mexico Putative Father Registry as required by New Mexico law. The court treated the Natural Father's motion to dismiss as a request for intervention, which it denied due to lack of standing. In denying *467 the motion to dismiss, the Utah court also rejected the Natural Father's argument that the New Mexico custody order should be given full faith and credit under the United States Constitution. The court concluded that full faith and credit was inappropriate because neither the Adoptive Parents nor Act of Love were named as parties and because it was a temporary, not final, order. It is from the final order denying the motion to dismiss the pending adoption that the Natural Father appeals.

STANDARD OF REVIEW
¶ 7 "Constitutional issues, including questions regarding due process, are questions of law that we review for correctness." Chen v. Stewart, 2004 UT 82, ¶ 25, 100 P.3d 1177. We review the denial of a motion to dismiss for correctness, granting no deference to the district court. In re Adoption of B.T.D., 2003 UT App 99, ¶ 11, 68 P.3d 1021. We also review standing and intervention issues under a correctness standard. See In re Adoption of K.C.J., 2008 UT App 152, ¶ 7, 184 P.3d 1239.

ANALYSIS
¶ 8 The Natural Father seeks to enforce a parental right to contest the adoption of I.K. Under Utah law, an unmarried biological father must establish his parental rights by strictly complying with certain statutory requirements. See Utah Code Ann. §§ 78B-6-120(1)(f), -121(1) to (5), -122(1) (2008). If he fails to meet these requirements, the statute provides an alternative three-part method for establishing parental rights. First, the unmarried biological father must not have known, and "through the exercise of reasonable diligence could not have known, before the time the mother executed a consent to adoption or relinquishment of the child for adoption, that a qualifying circumstance existed." Id. § 78B-6-122(1)(c)(i)(A). A qualifying circumstance exists when between the time of conception and the date of the mother's consent to adoption or relinquishment of the child for adoption, (1) either the mother or child permanently or temporarily resided in Utah; (2) the baby was born in Utah; or (3) the mother intended to give birth to or place the baby for adoption in Utah or under Utah law. Id. § 78B-6-122(1)(a). Second, the unmarried biological father must, prior to the mother's consent to adoption or relinquishment of the child for adoption, have "fully complied with the requirements to establish parental rights in the child, and to preserve the right to notice of a proceeding in connection with the adoption of the child" of the state where the child was conceived or the last state where the father knew, or through reasonable diligence should have known, that the mother resided. Id. § 78B-6-122(1)(c)(i)(B). Finally, the father must demonstrate a "full commitment to his parental responsibilities." Id. § 78B-6-122(1)(c)(i)(C). If the unmarried biological father fails to "fully and strictly comply" with these requirements, he is "considered to have waived and surrendered any right in relation to the child, including the right to . . . consent, or refuse to consent, to the adoption of the child." Id. § 78B-6-122(2).
¶ 9 In this case, it is undisputed that the Natural Father did not comply with the first set of Utah's statutory requirements. Therefore, he seeks to establish his parental rights through the alternative method. Arguably, under the first prong, the Natural Father did not know of a qualifying circumstance prior to the Birth Mother's relinquishment of the baby for adoption. Neither the Birth Mother nor the baby ever resided even temporarily in Utah, the baby was not born in Utah, and the record reveals no indication that the Birth Mother intended to give birth to the baby in Utah. Although the Birth Mother did place the baby for adoption with a Utah adoption agency, the Natural Father did not become aware of this fact until just before January 23, 2008, more than two months after the Birth Mother relinquished the baby for adoption. For these reasons, the Natural Father asserts he met the first prong. However, we need not decide this issue because we find that he failed to satisfy the second prong. A failure at any stage of this alternative method for establishing parental rights is fatal to the Natural Father's appeal.
¶ 10 Under the second prong, the Natural Father had to comply with the law of New *468 Mexico, where the baby was conceived. New Mexico law allows an unmarried biological father to establish his parental rights by initiating a paternity action. See N.M. Stat. §§ 32A-5-3(F)(4)(a)(1), -17(A)(5) (2008). The Natural Father initiated his paternity action in New Mexico on November 20, 2007, nine days after the Birth Mother relinquished the baby for adoption. This action clearly failed to comply with the Utah deadline. However, the Natural Father argues that applying the Utah deadline is a violation of his due process rights. The question then remains whether he complied with New Mexico law, for if not, he failed to comply with Utah law.
¶ 11 As to the third prong of the test, because we hereafter conclude that the Natural Father failed to satisfy the second prong, we need not consider whether he demonstrated a full commitment to his parental responsibilities. Thus, we turn next to the discussion of whether the Natural Father complied with New Mexico law.

I. THE NATURAL FATHER FAILED TO COMPLY WITH NEW MEXICO LAW
¶ 12 The Natural Father filed his paternity action after the Birth Mother relinquished the baby for adoption and after the Adoptive Parents filed an adoption petition. We first must determine whether this action was timely under New Mexico law applicable at the time the Natural Father filed his action in the courts of New Mexico.

A. The New Mexico Court of Appeals Decision in Helen G. I Was Reversed by the New Mexico Supreme Court and Is Not the Rule of Law
¶ 13 The Natural Father argues that he complied with New Mexico law applicable at the time he filed his paternity action. The New Mexico adoption statute requires consent to adoption from an "acknowledged father," which status may be obtained by filing an action for paternity. N.M. Stat. §§ 32A-5-3(F)(4)(a)(1), -17(A)(5) (2008). Though the statute does not specifically provide a deadline for this action, the New Mexico courts have interpreted it. At the time the Natural Father filed his paternity action, the New Mexico Court of Appeals had recently decided Helen G. v. Mark J.H. (Helen G. I), 140 N.M. 618, 145 P.3d 98 (Ct.App.2006), declaring that in order to establish parental rights as an acknowledged father, the time for filing a paternity action is during the pendency of the adoption proceeding. Id. at 105. The Natural Father argues that this was the then-current binding law. Thus, because the Adoptive Parents' adoption case was still proceeding at the time the Natural Father filed his paternity action, he argues that his filing was timely under New Mexico law. On the other hand, the Adoptive Parents and Act of Love (collectively Adoptive Parties) argue that because the Helen G. I case was pending certiorari review before the New Mexico Supreme Court at the time of the Natural Father's paternity action filing, the court of appeals decision had not yet become law. Rather, they assert that the New Mexico Supreme Court decision, filed on November 26, 2007, that reversed the court of appeals, is the correct statement of New Mexico law at the relevant time. See Helen G. v. Mark J.H. (Helen G. II), 143 N.M. 246, 175 P.3d 914 (2008). We agree with the Adoptive Parties.
¶ 14 When a case is granted certiorari review, it remains unresolved until the higher court takes final action. This is not to say that lower courts do not have the obligation to follow an intermediate appellate decision until it is reviewed. Indeed, "[w]hen the court of appeals renders a decision on an issue, that decision is automatically part of the law of this state, unless and until contravened by this court, the legislature, or the people through the processes authorized for the making of new law." Grand County v. Rogers, 2002 UT 25, ¶ 16, 44 P.3d 734. Thus, a lower court is not free to act in opposition to a court of appeals decision simply because the decision is under review by a higher court. See, e.g., Lakeside Cmty. Hosp. v. Tahoe Reg'l Planning Agency, 461 F.Supp. 1150, 1153 (D.Nev.1978) ("[T]his Court is duty bound to follow the law as articulated by the Court of Appeals for this Circuit. That a writ of certiorari has issued from the United States Supreme Court to the Court of *469 Appeals does not relieve this Court of that duty." (internal citation omitted)). However, once the certiorari review is complete and a decision is announced by the higher court, that new decision becomes the law in that case, replacing the decision announced by the intermediate court to the extent it reverses, vacates, or otherwise modifies it. The new ruling also has retroactive effect. Thus, the decision of the court of appeals in Helen G. I, though binding on lower courts at the time it was announced, represented an intermediate step in a case that was not yet final. Now that certiorari review is complete, the decision of the supreme court in Helen G. II constitutes the binding rule of law. As such, we look next at the New Mexico Supreme Court decision.

B. The New Mexico Supreme Court Decision in Helen G. II Does Have Retroactive Effect
¶ 15 The decision announced by the New Mexico Supreme Court in Helen G. II reversed the New Mexico Court of Appeals and declared that the time for filing a paternity action in order to establish parental rights is "before the initiation of adoption proceedings." 175 P.3d at 920 (emphasis added). However, the Natural Father asks us not to apply this decision retroactively. To determine whether a New Mexico Supreme Court decision that reverses the New Mexico Court of Appeals should apply retroactively, we must turn to the law of New Mexico. New Mexico has "adopt[ed] a presumption of retroactivity for a new rule imposed by a judicial decision in a civil case." Beavers v. Johnson Controls World Servs., Inc., 118 N.M. 391, 881 P.2d 1376, 1383 (1994). However, absent an express declaration within the individual opinion, "the presumption may be overcome by a sufficiently weighty combination of one or more of the Chevron Oil factors, which [the New Mexico Supreme Court has] espoused." Id. at 1383. The parties have devoted substantial discussion to these factors. The presumption of retroactivity, and the exception to it, apply only when a judicial opinion announces a "new rule." Id. Indeed, "[t]he issue of retroactive effect arises only when a court's decision overturns prior case law or makes new law." Santillanes v. New Mexico, 115 N.M. 215, 849 P.2d 358, 366 (1993). On the contrary, when a court interprets for the first time an existing, legislatively-created statute, the judicial decision is not considered to be a new rule, but merely clarification of the existing rule. See, e.g., Rivers v. Roadway Express, Inc., 511 U.S. 298, 312-13, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) ("A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction."); Id. n. 12 ("[W]hen this Court construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law."); Kendrick v. Dist. Att'y of Phila. County, 591 Pa. 157, 916 A.2d 529, 538 (2007) ("`Therefore, when we have not yet answered a specific question about the meaning of a statute, our initial interpretation does not announce a new rule of law. Our first pronouncement on the substance of a statutory provision is purely a clarification of existing law.'" (quoting Fiore v. White, 562 Pa. 634, 757 A.2d 842, 848 (2000))). Accordingly, a first-time interpretation of an existing statute is to be applied retroactively.
¶ 16 In the case of Helen G. II, the New Mexico Supreme Court interpreted a provision of an existing statute that it had not previously interpreted. 175 P.3d at 916. Specifically, the court interpreted the provision in the New Mexico Adoption Act requiring an unmarried biological father to file a paternity action in order to establish his right to consent to an adoption. The court said that to be timely, the petition must be filed "before the initiation of adoption proceedings." Id. at 920. As such, the decision was a first-time statutory interpretation and not a new rule. Therefore, under New Mexico law, the deadline set for establishing acknowledged father status announced in Helen G. II applies retroactively. The Natural Father failed to meet that deadline and consequently failed to comply with the requirements set forth by New Mexico law. As a result, he also did not meet the Utah law requirement of compliance with another *470 state's law[3] and failed to establish his parental rights. See Utah Code § 78B-6-122(1)(c)(i)(B). Therefore, his consent was not required by Utah law for the adoption, and it was not error for the district court to deny his motion to dismiss the adoption.

C. The Natural Father Did Not Meet the Deadline to Qualify Under the "Any Other Factor" Element of the New Mexico Statute
¶ 17 The Natural Father also argues that in the event he did not establish his parental rights by timely filing a paternity action in New Mexico, his actions also qualified him as an acknowledged father under a different statutory provision of New Mexico law.
¶ 18 Under the New Mexico adoption statute, an unmarried biological father may establish parental rights for an adoptee under six months of age at the time of placement by obtaining the status of acknowledged father. In New Mexico, an individual earns this status by satisfying any one of seven requirements, which include filing a paternity action, as previously discussed, or through "any other factor the court deems necessary to establish a custodial, personal or financial relationship with the adoptee." N.M. Stat. § 32A-5-3(F)(4)(a)(1), (7) (2008).
¶ 19 The Natural Father claims to have satisfied this "any other factor" requirement. He argues that because, once he learned of the child's birth, he took reasonable steps to become an acknowledged father by filing a paternity action, and he offered support for the child to the Birth Mother, his actions constitute factors that established the required relationship. However, as the Adoptive Parties assert, this requirement is also subject to the deadline announced in Helen G. II. Indeed, the New Mexico Supreme Court stated that "a biological father [may] take any other action prior to the filing of the adoption petition that the court `deems necessary to establish a custodial, personal or financial relationship with the adoptee.'" Helen G. II, 175 P.3d at 925 (emphasis added) (quoting N.M. Stat. § 32A-5-3(F)(4)(a)(7)).
¶ 20 The Natural Father both filed his paternity action and offered financial support after the Adoptive Parents filed their petition for adoption. Accordingly, he did not timely comply with New Mexico law and thus failed to meet the requirements of Utah law.

II. THE NATURAL FATHER'S FAILURE TO COMPLY WITH NEW MEXICO LAW RENDERS HIS DUE PROCESS ARGUMENT MOOT
¶ 21 The Natural Father has failed to establish his parental rights under either New Mexico or Utah law. As a consequence, no due process rights accrue to him with regard to the adoption proceeding. As previously explained, the Utah Adoption Act requires an unmarried biological father without knowledge of a Utah adoption to comply with another state's requirements for establishing parental rights "before the mother execute[s] a consent to adoption or relinquishment of the child for adoption." Utah Code Ann. § 78B-6-122(1)(c)(i)(B) (2008).
¶ 22 We have previously held this deadline in the Utah adoption statute to be facially valid. See, e.g., In re Adoption of Baby Boy Doe, 717 P.2d 686, 689 (Utah 1986) (stating that prior cases have established the facial validity of Utah Code section 78-30-4(3) (Supp.1983)[4]); Wells v. Children's Aid Soc'y of Utah, 681 P.2d 199, 207 (Utah 1984) (holding that the provisions of section 78-30-4(3) for terminating an unwed father's parental rights for a newborn infant are facially valid because the state has a compelling interest in speedy and final custody determinations and the statute is narrowly tailored to achieve that goal). However, we have also found the *471 statute unconstitutional as applied when an unwed father "`is successful in showing that the termination of his parental rights was contrary to basic notions of due process, and that he came forward within a reasonable time after the baby's birth.'" Baby Boy Doe, 717 P.2d at 689 (quoting Ellis v. Soc. Servs. Dep't of the Church of Jesus Christ of Latter-Day Saints, 615 P.2d 1250, 1256 (Utah 1980)). If the father can make such a showing, the court can prevent termination by applying the common law impossibility exception to the statutory deadline, which is available "where a father does not know of the need to protect his rights," such that "there is no `reasonable opportunity' to assert or protect parental rights." Id. at 691.
¶ 23 Thus, under the impossibility exception articulated in Baby Boy Doe and similar cases, the Natural Father argues that applying this statutory deadline is a violation of his due process rights. If we were to reach this issue, the Adoptive Parties argue that amendments to the statute have eliminated the common law impossibility exception. Indeed, when Ellis and Baby Boy Doe were decided, the statute did not contain a provision allowing an unmarried biological father to establish his parental rights in another state. Baby Boy Doe, 717 P.2d at 688 (citing Utah Code Ann. § 78-30-4(3) (Supp.1983)). However, the Legislature amended the statute first to allow an unmarried biological father to file within ten days of the time it became possible for him to file, Utah Code Ann. § 78-30-4.8 (Supp.1990), and later to allow him to preserve parental rights in another qualifying state. Id. § 78B-6-122(1)(c)(i)(B) (2008). We have not yet dealt with whether, in light of these statutory amendments, the common law impossibility exception still exists. However, we need not reach that question here.
¶ 24 While we note that this case would likely not present a due process violation as applied because the Natural Father had sufficient opportunity to protect his parental rights, the fact remains that he failed to comply with New Mexico law. Without establishing his parental rights in Utah or another state, the Natural Father effectively lost those rights and any due process rights associated with them.

III. FAILURE TO ESTABLISH PARENTAL RIGHTS DEPRIVED THE NATURAL FATHER OF STANDING TO INTERVENE IN THE ADOPTION PROCEEDING
¶ 25 Finally, the Natural Father argues that the district court erred in holding that he lacked standing to intervene in the adoption proceeding because the New Mexico district court order determining his paternity and right to custody was sufficient to give him an interest in the proceeding, regardless of Utah's determination of his parental rights. The Natural Father's standing claims arise under the Utah Rules of Civil Procedure and Utah case law. We will discuss both grounds.

A. Utah Rule of Civil Procedure 24 Does Not Provide the Natural Father with Standing to Intervene
¶ 26 The Natural Father first claims standing under Utah Rule of Civil Procedure 24, which grants a timely application for intervention "when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest." Utah R. Civ. P. 24(a)(2). According to the rule, the party must have an interest in the proceeding. In the case of an adoption, that interest would amount to parental rights in the child. As previously discussed, the Natural Father failed to timely establish his parental rights under either Utah or New Mexico law. Therefore, without parental rights, he has no interest in the proceeding that would endow him with standing to intervene under rule 24.[5]

*472 B. Utah Common Law Does Not Provide the Natural Father with Standing to Intervene

¶ 27 The Natural Father next argues that under Utah case law, his New Mexico paternity order was sufficient to vest in him a protectable interest, regardless of whether Utah had determined his parental rights. For this argument, he relies on a Utah Court of Appeals case, In re Adoption of K.C.J., 2008 UT App 152, 184 P.3d 1239. In K.C.J., the court of appeals majority said,
[T]he presence or absence of parental rights does not determine whether a person has standing to intervene in an adoption proceeding. Rather, what is required is a person's direct interest in the subject matter of the litigation such that [his or her] rights may be affected, for good or for ill, and this interest may arise from the intervenor's status or circumstances.
2008 UT App 152, ¶ 11, 184 P.3d 1239 (alterations in original) (internal citations and quotation marks omitted). In K.C.J., the Utah district court found standing where the putative father had obtained an apparently valid paternity order in Oklahoma during the Utah adoption proceeding, but after the mother's relinquishment of the child for adoption. Id. ¶ 18. The court of appeals affirmed the putative father's standing to intervene, stating, "Although . . . [the putative father] may have failed to comply with the Utah law governing unmarried biological fathers, he apparently acted within the laws of the State of Oklahoma." Id. Thus, he had a "`protectable interest in the litigation'" and was "entitled to have his right to further participation adjudicated after presenting relevant evidence and legal arguments in support of his claims." Id. ¶ 11 (quoting Gedo v. Rose, 2007 UT App 154, ¶ 7, 163 P.3d 659). Thus, as the Adoptive Parties suggest, under K.C.J., an unwed father with a valid paternity order from another state is entitled to the opportunity to argue the effect of that order in Utah. Id. ¶¶ 10, 13.
¶ 28 In the instant case, the Utah district court afforded the Natural Father the opportunity to argue the effect of his New Mexico paternity order; he argued the validity of the order under the Full Faith and Credit Clause in his briefing before the district court. Although the court later rejected his arguments, refusing to enforce the paternity order, the Natural Father was afforded the due process required under K.C.J.
¶ 29 In addition, in K.C.J. the court granted standing based on a valid Oklahoma paternity order. Id. ¶ 18. Here, the Natural Father does not have a valid paternity order from another state that vests him with an interest sufficient for standing. As explained above, because the Natural Father failed to file his paternity action within the time required by New Mexico law, he did not establish his status as an acknowledged father, and the later paternity order was of no force or effect. As a result, he gained no legal rights in New Mexico and the district court correctly found that he did not have standing to intervene in the adoption proceeding.

CONCLUSION
¶ 30 The Natural Father filed his paternity action in New Mexico after the Utah adoption proceedings had begun. While the New Mexico statute grants acknowledged father status upon the filing of a paternity action, filing must occur before the initiation of an adoption proceeding. The New Mexico Court of Appeals decision in Helen G. I allowing for filing during the pendency of an adoption proceeding does not constitute binding law because it was reversed on certiorari review. The New Mexico Supreme Court's reversal of the case, requiring filing prior to the initiation of an adoption proceeding, was binding because as a first-impression statutory interpretation, it did not announce a new rule of law and therefore had retroactive effect. Accordingly, the Natural Father failed to comply with New Mexico law, and it was not error for the district court to deny *473 his motion to dismiss the adoption. Because the Natural Father failed to establish his parental rights in New Mexico, he also failed to accrue the concomitant due process rights with regard to application of the Utah deadline for establishing his parental rights. Finally, the district court did not err by finding that the Natural Father lacked standing to intervene because his New Mexico paternity order was invalid and of no force or effect and therefore did not grant him a protectable interest in the adoption proceeding.
¶ 31 Affirmed.
¶ 32 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH and Justice NEHRING concur in Justice WILKINS' opinion.
NOTES
[1] Formerly Utah Code section 78-30-4.14, this statute and the entire Adoption Act were renumbered in February 2008. Because none of the relevant language was changed, we cite to the current version throughout this opinion.
[2] The Natural Father claims that he could not file with the Putative Father Registry until he had obtained a paternity test, which he has been unable to obtain without access to I.K.
[3] The trial court found, and the Natural Father does not challenge the fact, that he failed to establish his parental rights under the law of any other state.
[4] Utah Code section 78-30-4(3) was the 1983 predecessor to the current section 78B-6-121(3). Section 78-30-4(3) required a man claiming paternity to protect his parental rights "by registering with the registrar of vital statistics in the department of health . . . prior to the date the illegitimate child is relinquished or placed with an agency licensed to provide adoption services or prior to the filing of a petition by a person with whom the mother has placed the child for adoption." Id. § 78-30-4(3)(a), (b) (Supp.1983).
[5] The Natural Father asks us to give full faith and credit to the New Mexico district court order determining his paternity and granting him temporary custody of I.K. However, this argument is not at issue. The February 8, 2008 paternity order was of no force and effect because he had not established his initial right to make the determination. Because he missed the deadline required by New Mexico law to qualify as an acknowledged father, the district court in New Mexico was unable to grant him any rights. Thus, in the event we did give full faith and credit to the February 8 order, which determination we do not make today, we could give no more credit to the order than New Mexico would give. As the order would be of no force or effect in New Mexico, we need not grant it any greater status.