2008 UT App 449

In the matter of the ADOPTION OF Baby Boy DOE, a minor.

N.T., Appellant,

v.

Jane Doe and John Doe, Appellees.

No. 20071013–CA.

Court of Appeals of Utah.

Dec. 11, 2008.

Daniel S. Drage, Ogden, for Appellant.

Larry S. Jenkins and Lance D. Rich, Salt Lake City, for Appellees.

Before Judges BENCH, DAVIS, and McHUGH.

MEMORANDUM DECISION

BENCH, Judge:

¶ 1 N.T. appeals the trial court's dismissal of his motions to intervene and to dismiss a petition for adoption of the minor Baby Boy Doe. The issues now before us are the result of the Utah Supreme Court's remand of this case to the trial court based on procedural issues not pertinent to the instant appeal. A full recitation of the underlying facts can be found in the supreme court's decision. *See Thurnwald v. A.E.*, 2007 UT 38, ¶¶ 6–17, 163 P.3d 623.

¶ 2 N.T. contends that he has strictly complied with the requirements statutorily placed upon him as an unmarried biological father and that his consent is necessary for the adoption of Baby Boy Doe. An unmarried biological father's consent for the adoption of a minor is not required unless, within one business day of the child's birth, he

(a) initiates proceedings in a district court ... to establish paternity ...;

(b) files with the court that is presiding over the paternity proceeding a sworn affidavit:

(i) stating that he is fully able and willing to have full custody of the child;

(ii) setting forth his plans for care of the child; and

(iii) agreeing to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth;

(c) ... files notice of the commencement of paternity proceedings ... with the state registrar of vital statistics within the Department of Health ...; and

(d) offered to pay and paid a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth, ... unless:

(i) he did not have actual knowledge of the pregnancy;

(ii) he was prevented from paying the expenses by the person or authorized agency having lawful custody of the child; or

(iii) the mother refuses to accept the unmarried biological father's offer to pay the expenses....

Utah Code Ann. § 78B–6–121(3)(a)–(d) (Supp.2008);[1] *see also Thurnwald,* 2007 UT 38, ¶ 46, 163 P.3d 623 (granting an unmarried biological father "one business day after the birth of his child to complete the statutory requirements"). Further, an unmarried biological father's consent is required "only if he strictly complies" with the above requirements. Utah Code Ann. § 78B–6–120(1)(f) (Supp.2008).

¶ 3 As a result of the supreme court's decision, *see Thurnwald,* 2007 UT 38, ¶¶ 46–47, 163 P.3d 623, the parties now agree that N.T. timely initiated proceedings to establish his paternity and properly filed notice with the Department of Health. For the purposes of our decision we will assume, without deciding, that (1) a verified petition for determination of paternity qualifies as the statutorily required sworn affidavit; (2) rule 15 of the Utah Rules of Civil Procedure applies to adoption proceedings, thereby permitting amendment of a verified petition for determi-

nation of paternity; and (3) N.T. was justified in not paying for the mother's expenses.

¶ 4 Despite these assumptions, N.T.'s Amended Verified Petition for Determination of Paternity (the Amended Petition) cannot be construed as strictly complying with the statutory requirements. First, even if rule 15 can be used to allow N.T. to amend his original petition, the Amended Petition cannot qualify as a sworn affidavit because N.T. did not sign it and it was not notarized. In essence, N.T. asks us to allow the content of the Amended Petition to relate back to the date of the original petition while at the same time allowing the verifying attributes of the original petition to relate forward to the amended version. N.T.'s unsigned, unverified filing cannot be considered "a sworn affidavit." *See* Utah Code Ann. § 78B–6–121(3)(b).

¶ 5 Second, regardless of which document is considered, N.T. fails to set forth any plan for the care of the child. The language in both documents is so lacking in specifics regarding how N.T. will care for the child that neither document strictly complies with the statute. On appeal, N.T. claims that the pleading found in both versions of the document—requesting that he "be awarded the permanent care, custody, and control of the minor child ... and assume all financial responsibilities"—adequately sets forth his plan. We disagree. Although not expressly stated in the Utah Adoption Act, a plan for the care of a child logically must specify, at a minimum, how the putative father will financially care for the child and provide some glimpse into how he will meet daily caregiving responsibilities.[2] N.T.'s petitions are utterly deficient in "setting forth his plans for care of the child." *Id.* § 78B–6–121(3)(b)(ii).

¶ 6 Because of these two deficiencies, N.T. has not strictly complied with the statute. The trial court therefore properly denied

---

1. We cite to the current, recodified Title 78B for convenience throughout this decision. The cited provisions have not substantively changed from the comparable versions in effect at the time of Baby Boy Doe's birth in 2004.

2. While this may not require a detailed, day-to-day plan for the child's care, we believe the legislature intended that the putative father at least specify that he has a source of income and identify who will care for the child while he is working to earn that income.

N.T.'s motions to intervene and to dismiss the petition for adoption.

¶ 7 Affirmed.

¶ 8 I CONCUR: CAROLYN B. McHUGH, Judge.

DAVIS, Judge (concurring):

¶ 9 I concur with the lead opinion in this case and agree that N.T.'s petitions are, at best, minimal. I write separately, however, to express my concern that Utah Code section 78B–6–121(3)(b)(i)–(iii), as currently written, is vague and essentially operates to divest unmarried biological fathers of the right to raise their children for substantive "technicalities" that have not yet been adequately defined. *See* Utah Code Ann. § 78B–6–121(3)(b)(i)–(iii) (Supp.2008).

¶ 10 The State has an important interest in facilitating the expeditious placement of newborn children born out-of-wedlock for adoption, as well as ensuring the stability of those placements once they have been made. The case law interpreting "strict compliance" with the relevant statutory schemes therefore predominantly involves factual situations where a *time delay,* i.e., a *procedural defect,* in filing the requisite paternity action has disposed of the need for the unmarried biological father's consent to the adoption. *See Lehr v. Robertson,* 463 U.S. 248, 265, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) ("The legitimate state interests in facilitating the adoption of young children and having the adoption proceeding completed expeditiously ... also justify a trial judge's determination to require all interested parties to adhere precisely to the *procedural* requirements of the statute." (emphasis added)); *Thurnwald v. A.E.,* 2007 UT 38, ¶ 35, 163 P.3d 623 (holding that "cutting off postbirth weekend and holiday *filing* opportunities for unwed fathers is not necessary to achieve the state's compelling interests" (emphasis added)); *Sanchez v. L.D.S. Soc. Servs.,* 680 P.2d 753, 755 (Utah

1984) (noting that because of the unique nature of adoptions, "*a firm cutoff date* [for filing a paternity action] is reasonable, if not essential" (emphasis added)); *In re Adoption of K.C.J.,* 2008 UT App 152, ¶ 17, 184 P.3d 1239 (noting that "we have previously acknowledged [the] ... harsh results for unwed fathers who *delay* in asserting their legal interests" (emphasis added)).

¶ 11 The case law appears to be silent, however, as to what, *substantively,* must be included in an unmarried biological father's sworn affidavit (in this case, a verified petition) to strictly comply with the statute's requirements. Instead, section 78B–6–121(3)(b)(i)–(iii) requires only that the unmarried biological father file a sworn affidavit

(i) stating that he is fully able and willing to have full custody of the child;

(ii) setting forth his *plans for care* of the child; and

(iii) agreeing to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth.

Utah Code Ann. § 78B–6–121(3)(b)(i)–(iii) (emphasis added). While it appears that counsel for an unmarried biological father could simply quote the text of the statute verbatim to substantively comply with subsections (i) and (iii), the same cannot be said of subsection (ii). *See id.* § 78B–6–121(3)(b)(ii). Indeed, there is absolutely no guidance in that subsection as to what, exactly, is a satisfactory "plan[ ] for care of the child." It is unclear whether there must be a specific reference to who will take care of the child and when, or whether it is simply enough for the father to state that he will care for the child as he sees fit.[1] Arguably, many, if not most, parents do not know their daily child care plans at the time their child is born. Often, even if they do, those plans change. Moreover, there is nothing to prevent an unmarried biological father from set-

---

1. It is important to note that in another context the Utah Legislature has clearly defined what, specifically, must be included in a "parenting plan." *See* Utah Code Ann. § 30–3–10.9(2) (2007). Utah Code section 30–3–10.9(2), the provision that defines a parenting plan for divorcing parents, is quite specific. *See id.* ("The

parenting plan *shall contain* provisions for resolution of future disputes between the parents, allocation of decision-making authority, and residential provisions for the child, and provisions addressing notice and parent-time responsibilities in the event of relocation of either party." (emphasis added)).

ting forth a detailed plan in his sworn affidavit, only to abandon it as soon as he has been granted custody.[2] Accordingly, the requirement found in section 78B–6–121(3)(b)(ii) seems illusory at best and, at worst, invites fabrication.

¶ 12 While the State's interest in facilitating expeditious and sound adoptions is important, there is also a distinct public policy interest in supporting "an unwed father's [provisional] right to his relationship with his newborn." *Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199, 206 (Utah 1984). Moreover, there is also a distinct—albeit less popular—public policy interest in allowing an unmarried biological father the opportunity to raise his child as a single father if he is both interested and capable of doing so. Severing an unmarried biological father's rights because the *substance* of his sworn affidavit does not strictly comply with a vague and illusory statutory guideline promotes, in my opinion, "the unconditional respect for the relatively exclusive maternal decision-making about newborns, regardless of children's best interests, of any legal paternity interests, and of strong social policy favoring two parents for each child born as a result of consensual sex."[3] Jeffrey A. Parness, *Lost Paternity in the Culture of Motherhood: A Different View of Safe Haven Laws*, 42 Val. U.L.Rev. 81, 97 (2007). Moreover, severing an unmarried biological father's parental rights based on such technicalities serves to reinforce traditional notions about gender and childrearing—i.e., that women are biologically better suited for raising children—notions that are antiquated and harmful to both men and women.

¶ 13 I recognize that the Utah Legislature has imposed an onerous and exacting burden upon unmarried biological fathers to comply strictly with the statutory scheme or risk losing all rights to their children. Indeed, the Utah Legislature has underscored the importance of strict compliance by referencing this requirement numerous times throughout the Utah Adoption Act. *See, e.g.,* Utah Code Ann. §§ 78B–6–102(6)(b), –102(6)(f), –106(2), –120(1)(f), –122(2) (Supp. 2008). I am concerned, however, that there is no guidance as to what satisfies the substance of section 78B–6–121(3)(b)(ii), leaving an unmarried biological father in an impossible bind: Strictly comply with a vague and ill-defined statutory requirement or risk losing all rights to his child. The lead opinion correctly observes that "N.T.'s petitions are utterly deficient in 'setting forth his plans for care of the child.'" *Supra* ¶ 5. It is entirely unclear, however, precisely what N.T. could have—or should have—done differently that would have yielded a different result in this case. The unpredictable nature of section 78B–6–121(3)(b)(ii) is, in my opinion, highly problematic and warrants clarification.

---

**2.** I use the term "custody" advisedly because in the context of an adoption proceeding, an "all or nothing" environment prevails. While many adoption proceedings involve a biological mother's having already relinquished any rights respecting the child, some do not; and it is unclear whether, in the event the biological father intervenes, the biological mother may have second thoughts about her involvement in the life of the child.

**3.** This idea is referred to by some legal scholars as "the culture of motherhood" and promotes the idea

that an unwed genetic mother knows what is best for her child, prompting an unconditional respect under the law for her right to act alone on matters involving her young child. This results in a projection ... of the genetic father as, at best, a stranger to his newborn offspring or, at worst, ... a deadbeat dad.

Jeffrey A. Parness, *Lost Paternity in the Culture of Motherhood: A Different View of Safe Haven Laws*, 42 Val. U.L.Rev. 81, 82–83 (2007). This is particularly problematic in situations where, as here, the mother has relinquished her custody to the newborn child.