233 P.3d 517 (2010)
2010 UT App 114
In the matter of the ADOPTION OF BABY GIRL, a minor.
E.G. and N.G., Petitioners and Appellees,
v.
C.C.D., Respondent and Appellant.
No. 20090101-CA.
Court of Appeals of Utah.
May 6, 2010.
*518 Patricia L. Latulippe, Salt Lake City, for Appellant.
Bill O. Heder, K. Paul MacArthur, and Chad T. Warren, Provo, for Appellees.
Before Judges ORME, THORNE, and VOROS.

OPINION
VOROS, Judge:
¶ 1 C.C.D. challenges the adoption of Baby Girl, arguing that the district court erred in allowing the adoption without his consent. The adoptive parents defend the district court's order. They contend that C.C.D.'s consent to the adoption was not necessary, because he failed to comply with relevant provisions of the Utah Adoption Act (the Act). We affirm.

BACKGROUND
¶ 2 C.C.D. is the unmarried biological father of Baby Girl. He had a relationship with the birth mother for several months but was not in a relationship with her at the time Baby Girl was born. Three and a half months before Baby Girl was born, C.C.D. filed a Petition for Paternity and an Affidavit as required by Utah Code section 78B-6-121(3). See Utah Code Ann. § 78B-6-121(3) (Supp.2009). Both the Petition and the Affidavit *519 stated C.C.D.'s desire for full custody of his child and his ability to provide a home for the child. He explained that he had been working two jobs in order to save money but that he planned to quit his second job when the baby was born. He had saved money to buy clothes, a car seat, a crib, and other necessary baby items. He also offered to help the birth mother with expenses. He explained that his sister-in-law would care for the baby while he was at work, but that he would care for it the rest of the time. He also stated that he had met with various professionals to educate himself about childrearing and that he had experience with children. In the Petition, he proposed a division of some financial responsibilities between himself and the birth mother, but generally stated that he intended to provide full financial support for the child and would not request child support payments from the birth mother. C.C.D. also filed a Notice of Commencement of Paternity Proceedings with the Utah Department of Health Office of Vital Records and Statistics, as required by Utah Code section 78B-6-121(3)(c). See id. § 78B-6-121(3)(c).
¶ 3 Baby Girl was born August 6, 2008. The birth mother signed a Consent for Adoption two days later. C.C.D. learned of the birth four days after that, when his attorney received a letter from the birth mother stating that she had given birth and consented to adoption. C.C.D. filed an objection to the adoption along with two affidavits again stating his desire to have full custody of the child and stating the efforts he had made to provide financial support to the birth mother.
¶ 4 The district court determined that C.C.D. had not strictly complied with the provisions of Utah Code section 78B-6-121(3)(b) and (d) and therefore had failed to preserve his right to contest the adoption. C.C.D. appeals.

ISSUE AND STANDARD OF REVIEW
¶ 5 On appeal, C.C.D. contends that the district court erred in ruling that he failed to strictly comply with the requirements in Utah Code section 78B-6-121(3)(b) and (d) and, consequently, erred in concluding that the adoption could proceed without C.C.D.'s consent. First, C.C.D. argues that the district court misapplied subsection (b)(ii), which requires an unmarried biological father to "set[] forth his plans for care of the child," id. § 78B-6-121(3)(b)(ii). C.C.D. contends that the district court violated his constitutional rights by requiring him to state how he planned to care for Baby Girl if he were deported. Next, C.C.D. argues that the district court misapplied subsection (b)(iii), which requires an unmarried biological father to "agree[] to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth," id. § 78B-6-121(3)(b)(iii), by finding that he did not agree to a court order of child support. Finally, C.C.D. argues that the district court misapplied subsection (3)(d). That subsection requires an unmarried biological father to aver that he has "offered to pay and paid a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth." Id. § 78B-6-121(3)(d). C.C.D. contends that the district court misapplied this subsection and violated his due process rights by ruling that he did not pay any money to the birth mother prior to the birth. Because of our disposition, we consider only whether the district court erred in determining that C.C.D. failed to strictly comply with Utah Code section 78B-6-121(3)(b). "We review a district court's interpretation of a statute for correctness." O'Dea v. Olea, 2009 UT 46, ¶ 15, 217 P.3d 704.

ANALYSIS
¶ 6 The State of Utah "has a compelling interest in providing stable and permanent homes for adoptive children in a prompt manner, in preventing the disruption of adoptive placements, and in holding parents accountable for meeting the needs of children." Utah Code Ann. § 78B-6-102(5)(a) (2008). In addition, "adoptive children have a right to permanence and stability in adoptive placements." Id. § 78B-6-102(5)(c). An unmarried biological father's consent to an adoption is not required unless he "demonstrates a timely and full commitment to the responsibilities of parenthood, both during *520 pregnancy and upon the child's birth." Id. § 78B-6-102(5)(e). The Act specifies how he must demonstrate that commitment:
[C]onsent of an unmarried biological father is not required unless, prior to the time the mother executes her consent for adoption or relinquishes the child for adoption, the unmarried biological father:
(a) initiates proceedings in a district court of Utah to establish paternity under Title 78B, Chapter 15, Utah Uniform Parentage Act;
(b) files with the court that is presiding over the paternity proceeding a sworn affidavit:
(i) stating that he is fully able and willing to have full custody of the child;
(ii) setting forth his plans for care of the child; and
(iii) agreeing to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth;
(c) consistent with Subsection (4), files notice of the commencement of paternity proceedings, described in Subsection (3)(a), with the state registrar of vital statistics within the Department of Health, in a confidential registry established by the department for that purpose; and
(d) offered to pay and paid a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth, in accordance with his financial ability, unless:
(i) he did not have actual knowledge of the pregnancy;
(ii) he was prevented from paying the expenses by the person or authorized agency having lawful custody of the child; or
(iii) the mother refuses to accept the unmarried biological father's offer to pay the expenses described in this Subsection (3)(d).
See id. § 78B-6-121(3) (Supp.2009). This language clearly requires an unmarried biological father seeking to preserve his parental rights to comply with every subsection of this statute, including subparts (b)(i), (b)(ii), and (b)(iii). A father who fails to satisfy even one of these requirements may not block the adoption of his biological child.
¶ 7 Furthermore, our statutory scheme "is very clear that an unmarried putative father cannot maintain a right to consent to the adoption of his child unless he strictly complies with Utah law." O'Dea, 2009 UT 46, ¶ 3, 217 P.3d 704. His consent is required "only if he fully and strictly complies with the [statutory] requirements." Utah Code Ann. § 78B-6-120(1)(f) (Supp. 2009). Moreover, he "is presumed to know that the child may be adopted without his consent unless he strictly complies with the provisions of this chapter, manifests a prompt and full commitment to his parental responsibilities, and establishes paternity." Id. § 78B-6-102(6)(f) (2008). Finally, an unmarried parent "is not excused from strict compliance with the provisions of this chapter based upon any action, statement, or omission of the other parent or third parties." Id. § 78B-6-106(1) (2008). In sum, until an unmarried biological father "has complied precisely with the procedural requirements necessary to challenge an adoption proceeding, Utah courts have an overriding interest in facilitating adoption." Osborne v. Adoption Ctr. of Choice, 2003 UT 15, ¶ 32, 70 P.3d 58.

I. Subsection (b)(ii): Child Care Plans
¶ 8 C.C.D. challenges the district court's ruling that he failed to strictly comply with subsection (b)(ii). That subsection requires an unmarried biological father seeking to assert his parental rights to "set[] forth his plans for care of the child." Utah Code Ann. § 78B-6-121(3)(b)(ii). We recently reviewed this provision in In re adoption of Baby Boy Doe, 2008 UT App 449, 199 P.3d 368 (mem.), where we determined that an unmarried biological father had not strictly complied with the statutory requirements, because he submitted an unsigned, unverified filing that did not amount to "`a sworn affidavit.'" Id. ¶¶ 4-5 (quoting Utah Code Ann. § 78B-6-121(3)(b)). We further concluded that the biological father's filing, which requested only that he "be awarded the permanent care, custody, and control of the minor child ... and assume all financial responsibilities," *521 id. ¶ 5 (omission in original), did not adequately "set[ ] forth his plans to care for the child," Utah Code Ann. § 78B-6-121(3)(b)(ii). We noted that a putative father must at a minimum specify that he has a source of income and identify the child's caretakers:
Although not expressly stated in the Utah Adoption Act, a plan for the care of a child logically must specify, at a minimum, how the putative father will financially care for the child and provide some glimpse into how he will meet daily care-giving responsibilities.
...
While this may not require a detailed, day-to-day plan for the child's care, we believe the legislature intended that the putative father at least specify that he has a source of income and identify who will care for the child while he is working to earn that income.
Id. ¶ 5 & n. 2. In a concurring opinion, Judge Davis expressed concern that subsection (b)(ii) contains "absolutely no guidance ... as to what, exactly, is a satisfactory `plan[ ] for care of the child.'" Id. ¶ 11 (Davis, J. concurring) (alteration in original) (quoting Utah Code Ann. § 78B-6-121(3)(b)(ii)).
¶ 9 C.C.D. contends that his affidavit, filed in support of his petition for paternity, strictly complied with the minimal requirements of subsection (b)(ii). In it, he described generally his plan to care for Baby Girl:
a. I have saved money in order to be able to buy clothes, a car seat, a crib and other necessary items for the child.
b. I have made arrangements with my employer to take a few weeks off from work immediately after the child is born to care for the child and allow the child to adjust and bond with me.
c. I have made arrangements with my family to provide assistance and surrogate care for our minor child, after the initial bonding period, while I am working. My sister-in-law does not work and has two children at home. She has agreed to assist me in caring for the minor child while I work.
d. I will provide the majority of care for the minor child other than during the time period I am working.
¶ 10 The affidavit did not mention that C.C.D. is not a legal resident, nor did it state how Baby Girl would be cared for if C.C.D. were deported. The district court ruled that C.C.D. had not strictly complied with subsection (b)(ii) because "he failed to disclose how he would care for the child if legal action is taken against him by federal immigration or customs enforcement agencies."
¶ 11 In so ruling, the district court required more of C.C.D. than the statute itself does. By its own terms, subsection (b)(ii) requires no detail and certainly no contingency plans, even where a contingency may be foreseeable. All that is required is a plan describing, "at a minimum, how the putative father will financially care for the child and provid[ing] some glimpse into how he will meet daily care-giving responsibilities." In re Baby Boy Doe, 2008 UT App 449, ¶ 5, 199 P.3d 368. C.C.D.'s affidavit met this low threshold. We "will not `require more of a claimant than is required by the pertinent statutory language.'" Mecham v. Frazier, 2008 UT 60, ¶ 18, 193 P.3d 630 (quoting Xiao Yang Li v. University of Utah, 2006 UT 57, ¶ 18, 144 P.3d 1142). This is especially so where strict compliance is the standard. C.C.D.'s affidavit, though admittedly short on specifics, included all the information called for by the statute as interpreted by this court in In re Baby Boy Doe. In requiring more, the district court erred.

II. Subsection (b)(iii): Court Order of Child Support
¶ 12 C.C.D. also challenges the district court's ruling that he failed to strictly comply with subsection (b)(iii). Unlike subsection (b)(ii), subsection (b)(iii) is explicit: the petitioner must file a sworn affidavit "agreeing to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth." Utah Code Ann. § 78B-6-121(3)(b)(iii) (Supp.2009).
¶ 13 The requirement that an unmarried biological father agree to court-ordered child support differs in one key respect from the *522 other requirements in subsection (b). The other requirements assume that the petitioner will be awarded full custody of the child. For example, subsection (b)(i) requires him to swear that he is "fully able and willing to have full custody of the child." Utah Code Ann. § 78B-6-121(3)(b)(i). But the requirement that the father agree to court-ordered child support seems to assume that he will not be awarded custody. Custodial parents are not ordered to pay child support. Consequently, the requirement that the unmarried biological father agree to court-ordered child support addresses the contingency that he will establish paternity and thereby succeed in blocking the adoption, but nevertheless not be awarded custody of the child. In other words, the statute requires not only that the unmarried biological father declare under oath his willingness and ability to support the child if he is awarded custody but also his willingness to pay court-ordered child support if he is not. See generally id. § 78B-12-105 (2008) (stating that every child is presumed to be in need of the financial support of both parents, regardless of the parents' marital status); id. § 78B-12-108 (2008) (stating that the parent without physical custody of a child shall be required to pay child support).
¶ 14 We understand that an unmarried biological father such as C.C.D. might assumeor be led to believethat a mother who has consented to an adoption has categorically decided not to raise the child herself. But a mother willing to relinquish her rights in favor of adoptive parents might nevertheless be unwilling to relinquish her rights in favor of the biological father. Recognizing this possibility, subsection (b)(iii) requires the unmarried biological father to agree under oath to pay court-ordered child support in the event he wins the paternity battle but loses the custody battle.
¶ 15 C.C.D.'s Affidavit contains no such assurance. It states that he is prepared to fully support Baby Girl in the event he is awarded, in his words, "sole custody, care and control of the parties' minor child":
9. I am ready willing and able to take responsibility for our unborn child and to help [the birth mother] with expenses.
10. I am fully able and willing to have full custody of our minor child.
11. I have been working two jobs in order to save additional money to prepare for the birth of our minor child and to pay legal fees to pursue my parental rights.
But nowhere in the Affidavit, or in any other court filing, does C.C.D. agree to a court order of child support or otherwise express a willingness to assume financial responsibility for Baby Girl in the event that he is not awarded custody.
¶ 16 C.C.D. contends that subsection (b)(iii) should not be construed to require that "exact language" be used in order to fulfill its requirements. He argues that by seeking full custody, he was in effect "asking that the court enter an order requiring him to support his child." We agree that reciting the statutory language is not necessary to ensure strict compliance, see State v. Visser, 2000 UT 88, ¶ 11, 22 P.3d 1242 ("Strict compliance... does not mandate a particular script or rote recitation."), although it would surely suffice. However, the flaw in C.C.D.'s affidavit is not that he fails to recite the words of the statute, but that he fails in any words to agree to a court order of child support. In fact, he never mentions court-ordered child support. As explained above, because a parent awarded full custody would rarely if ever be ordered to pay child support, C.C.D.'s agreeing to care for Baby Girl in the event he is awarded full custody is not tantamount to agreeing to pay court-ordered child support in the event he is not.
¶ 17 At most, C.C.D.'s affidavit achieved substantial compliance with the statute. "However, substantial compliance with the statute is not enough." In re Adoption of W., 904 P.2d 1113, 1121 (Utah Ct.App.1995). The Act expressly and repeatedly demands strict compliance. See generally Hutter v. Dig-It, Inc., 2009 UT 69, ¶ 32, 219 P.3d 918 ("When interpreting a statute, we assume, absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning.").
¶ 18 Just as we will not require an unmarried biological father to do more than the pertinent statutory language demands, neither *523 will we require less. Accordingly, we affirm the district court's conclusion that C.C.D. did not satisfy the requirements of subsection (b)(iii). This case thus joins "multiple Utah cases extinguishing the rights of unwed fathers for failure to strictly comply with Utah law, sometimes on very minor issues of noncompliance." In re adoption of K.C.J., 2008 UT App 152, ¶ 12, 184 P.3d 1239.
¶ 19 We are aware that adhering to the exacting requirements of the Act may in individual cases yield unsatisfying results. But Utah courts have long recognized that holding unmarried biological fathers to strict compliance with clear rules advances the "foremost concern" of the adoption system, which is the best interest of the child. See Utah Code Ann. § 78B-6-102(1) (2008). For example, in Sanchez v. L.D.S. Social Services, 680 P.2d 753 (Utah 1984), a case that reviewed the timing of an unmarried biological father's attempt to assert his rights, our supreme court wrote that "[i]t is of no constitutional importance that [the father] came close to complying with the statute." Id. at 755. The Sanchez court explained, "Because of the nature of subject matter dealt with by the statute, a firm cutoff date is reasonable, if not essential." Id. It continued, "the actual and potential disruption of the adoption system by protracted litigation of such cases" would "hold[ ] the rights of putative adoptive parents, and the rights of the natural mother,... in limbo." Id. "The [resulting] damage... would be especially incalculable as to the children involved." Id.
¶ 20 A decade later, this court declared that "[t]he policy reasons for the statutory bright-line rule are compelling. If, in each adoption case, the putative father's diligence to establish his parental rights had to be individually assessed, the finality of our adoption system would be seriously undermined." Beltran v. Allan, 926 P.2d 892, 897 (Utah Ct.App.1996). Accordingly, we stated that "the statutes demand strict compliance with the notice of paternity requirement and not even substantial compliance will suffice." Id. at 896.[1]
¶ 21 To protect his parental rights, C.C.D. was required to strictly comply with all statutory requirements. However meritorious his remaining claims of error may bea question on which we express no opinionbecause he failed to comply with at least one, subsection (b)(iii), he cannot prevail on appeal. We therefore affirm the decision of the district court.[2]

*524 CONCLUSION
¶ 22 We conclude that C.C.D. strictly complied with Utah Code section 78B-6-121(3)(b)(ii). That subsection requires only that an unmarried biological father "set[] forth his plans for care of the child." Utah Code Ann. § 78B-6-121(3)(b)(ii) (Supp.2009). C.C.D.'s affidavit minimally, but adequately, set forth his plans for care of Baby Girl. The statute does not require an unmarried biological father to set forth contingency plans. In requiring this of C.C.D., the district court erred.
¶ 23 However, we affirm the district court's ruling that C.C.D. did not fully and strictly comply with subsection (b)(iii). He did not agree under oath to a court order of child support as required by that provision. Because the Act and Utah case law interpreting it require strict compliance, the district court correctly ruled that C.C.D. did not satisfy the statute. We thus affirm the district court's ruling that, pursuant to Utah Code section 78B-6-122(2)(b), C.C.D. failed to preserve his right to contest Baby Girl's adoption. See id. § 78B-6-122(2)(b) (2008). We do not reach the remaining issues.
¶ 24 Affirmed.
¶ 25 I CONCUR: GREGORY K. ORME, Judge.
THORNE, Judge (concurring in part and dissenting in part):
¶ 26 I concur with the majority opinion's conclusion that C.C.D. (Father) strictly complied with Utah Code section 78B-6-121(3)(b)(ii) by setting forth in his affidavit "his plans for care of the child." See Utah Code Ann. § 78B-6-121(3)(b)(ii) (Supp.2009). However, I cannot agree with the majority opinion that Father's affidavit constituted a failure to agree "to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth." See id. § 78B-6-121(3)(b)(iii). Nor do I agree with the district court that Father's failure to actually pay Baby Girl's mother (Mother) a reasonable portion of her pregnancy and birth expenses prior to her consent to adoption affects his paternal standing in light of the uncontested fact that Mother "refuse[d] to accept [Father's] offer to pay" such expenses, see id. § 78B-6-121(3)(d)(iii). Accordingly, I must respectfully dissent from the majority opinion's treatment of Father's compliance with section 76B-6-121(3)(b)(iii), as well as its ultimate result affirming the district court's decision below. I would reverse the district court's order and remand for further proceedings.

I. Father's Plan to Care for Baby Girl
¶ 27 The district court's order denying Father's objection to Baby Girl's adoption relied upon three purported failures by Father to strictly comply with his statutory obligations. The first of these purported failures was that Father's affidavit "did not set forth in detail his plans for care of the child" because it failed to explain his plans in the event that he was deported or suffered other legal consequence from his immigration status. See generally Utah Code Ann. § 78B-6-121(3)(b)(ii) (requiring a putative father to set forth by affidavit "his plans for care of the child"). I concur with the majority opinion's treatment of this issue and agree that neither great detail nor an accounting for contingencies was required for Father to satisfy his statutory obligation to disclose his child-care plans. See generally In re adoption of Baby Boy Doe, 2008 UT App 449, ¶ 5, 199 P.3d 368 (mem.) (discussing "plan" requirement of Utah Code section 78B-6-121(3)(b)(ii)).

*525 II. Father's Agreement to a Court Order of Child Support
¶ 28 The district court's second ground for denying Father's objection was that his affidavit failed to agree "to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth," see Utah Code Ann. § 78B-6-121(3)(b)(iii). The majority opinion affirms the district court's order on this ground, but in my opinion Father's affidavit does strictly comply with the statutory requirement. Accordingly, I cannot join with the majority opinion's analysis on this issue.[1]
¶ 29 The majority opinion treats Father's agreement to support Baby Girl as being conditioned on receiving full custody of Baby Girl. I do not read such a condition into Father's affidavit, which states,
6. I have tried to support [Mother] both financially and in other ways since learning of the pregnancy....
7. In addition, I have stopped by [Mother's] home and spoken with [Mother's] mother offering financial assistance and any other help [Mother] may need.
8. [Mother] has rebuffed all of my efforts and said no to any support.
9. I am ready[,] willing and able to take responsibility for our unborn child and to help [Mother] with expenses.

10. I am fully able and willing to have full custody of our minor child.
(Emphasis added.) Father's declaration of responsibility for Baby Girl is unconditionalif Father is awarded custody, such responsibility would be direct; if not, his responsibilities as a noncustodial parent would include paying child support and other expenses such as a portion of health care costs. Either way, Father's declaration is a clear and unconditional agreement to take responsibility for Baby Girl without regard to her ultimate placement and is not contingent on Father's receiving custody. Father's agreement to pay a portion of Mother's birth expenses is equally clear and unconditional. Accordingly, I cannot agree with the majority opinion that Father's agreement to take financial responsibility for Baby Girl was flawed because it was conditional upon his being awarded full custody.
¶ 30 Another potential flaw in Father's affidavit is that it did not agree "to a court order" to pay support and expenses, see Utah Code Ann. § 78B-6-121(3)(b)(iii). However, I do not see this omission as fatal to Father's strict compliance with the statute. Certainly, the payment of court-ordered child support and birth expenses falls within a father's responsibility to his child. Thus, Father's broad, unconditional acceptance of responsibility for Baby Girl encompasses, in my opinion, agreement to the entry of a court order to that effect. This is particularly so in the contextFather's affidavit was filed in conjunction with his own court pleadings seeking a court order regarding Father's paternity of Baby Girl.
¶ 31 Father's affidavit took responsibility for Baby Girl without condition. This broad statement surely encompasses the court-ordered payment of child support and related expenses in the event that Father was not awarded full custody of Baby Girl for any reason. Accordingly, I must dissent from the majority opinion's conclusion that Father's affidavit failed to agree "to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth." See id.

III. Mother's Refusal to Accept the Payment of Expenses
¶ 32 Because of my disagreement with the majority opinion regarding Father's agreement to pay child support, I also address the district court's third ground for denying Father's objection. The district court correctly observed that Father "did not pay any money *526 towards [Mother's pregnancy and birth] expenses until after [Mother] consented to the adoption." While there is a statutory requirement to pay such expenses, see Utah Code Ann. § 78B-6-121(3)(d), the statute contains an exception for situations, such as this one, where a mother refuses the offer of payment, see id. § 78B-6-121(3)(d)(iii). Accordingly, I must conclude that the district court erred when it did not deem Father's failure to pay birth expenses excused by Mother's refusal.
¶ 33 In order to preserve his parental rights, Utah Code section 78B-6-121(3)(d) mandates that, prior to a mother's consent to adoption, a putative father must have "offered to pay and paid a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth, in accordance with his financial ability." Id. § 78B-6-121(3)(d) (emphasis added). However, the statute includes several exceptions, including the situation where "the mother refuses to accept the unmarried biological father's offer to pay the expenses described in Subsection 3(d)," see id. § 78B-6-121(3)(d)(iii).
¶ 34 Here, the undisputed evidence is that Father offered to pay Mother his share of pregnancy and birth expenses and that, on several occasions, Mother refused to accept Father's offer to pay. Father's affidavit stated that he had tried to support Mother financially after learning of the pregnancy but that she had rebuffed his offers of support. Attached to Father's affidavit were two February 2008 letters to Mother, stating, "I want to take care of your pregnancy[, a]nything you need please just let me know [and] I will pay for that" and "[a]nything you need for you or for our baby please let me know." And Mother's own affidavit acknowledged Father's "previous offers of assistance."
¶ 35 In light of this undisputed evidence, the district court erred in denying Father's objection on the ground that Father had not actually paid Mother a share of her expenses. The statute requires such payment in order to preserve paternal standing "unless ... the mother refuses to accept" an offer of payment, see Utah Code Ann. § 78B-6-121(3)(d)(iii) (emphasis added). Thus, once Mother refused to accept Father's offer of payment, Father had strictly complied with the "offered to pay and paid" requirement of section 78B-6-121(3)(d), and his objection could not be denied on this basis.
¶ 36 I am aware that, shortly before the child's birth, Mother did submit an extensive, and likely unreasonable, list of expenses to Father for which she requested reimbursement. However, strict compliance is a two-way street, and the statute provides that Father was excused from actually paying Mother's expenses as a prerequisite to paternal standing upon her refusal to accept his initial offers of payment. There is no provision in the statute that allows Mother to reimpose the requirement of actual payment upon changing her mind.[2] Thus, for purposes of standing,[3] Father strictly complied with the relevant portion of the statute when Mother refused to accept his offer of payment. Cf. Peeples v. State, 2004 UT App 328, ¶ 9, 100 P.3d 254 ("Strict compliance is not, however, a one-way street, and a claimant is not required to do more than the Act clearly requires.").

IV. Constitutional Considerations
¶ 37 For the reasons expressed above, it is my opinion that Father strictly complied with the requirements of section 78B-6-121(3) and that the district court erred in each of its three conclusions to the contrary. However, I also believe that requiring strict compliance with the affidavit-content requirements of section 78B-6-121(3), with no opportunity for a putative father to amend or correct deficiencies in his pleadings and affidavits after a *527 mother's consent to adoption, could very well run afoul of the strong constitutional protections afforded to parental rights. Accordingly, I think it prudent to approach the interpretation and application of section 78B-6-121(3) with an eye toward avoiding potential constitutional infirmities rather than creating potential problems that will likely need to be addressed in the future. Cf. Cole v. Jordan Sch. Dist., 899 P.2d 776, 778 (Utah 1995) ("[I]t is this court's policy to interpret a statute if possible to avoid potential constitutional conflicts.").
¶ 38 First, I acknowledge that Utah law has declared that putative fathers must strictly comply with Utah Code section 78B-6-121 in order to preserve their parental rights when consent to adopt is given by the mother. See Utah Code Ann. § 78B-6-122(2) (2008) ("An unmarried biological father who does not fully and strictly comply with the requirements of Section 78B-6-121 and this section is considered to have waived and surrendered any right in relation to the child...."); In re Adoption of I.K., 2009 UT 70, ¶ 8, 220 P.3d 464 ("Under Utah law, an unmarried biological father must establish his parental rights by strictly complying with certain statutory requirements." (citing Utah Code Ann. § 78B-6-121(1) (2008))); In re adoption of Baby Boy Doe, 2008 UT App 449, ¶ 2, 199 P.3d 368 (mem.) ("[A]n unmarried biological father's consent is required `only if he strictly complies' with [section 78B-6-121(3)(a)-(d)]."). However, it is also true that an unwed father's "opportunity interest in developing a relationship with his newborn" is a provisional right protected by the due process clause of the Utah Constitution. See Thurnwald v. A.E., 2007 UT 38, ¶ 28, 163 P.3d 623. "We measure the statutory specifications for the termination of that provisional right against the tests of compelling state interest and narrowly tailored means." Wells v. Children's Aid Soc'y of Utah, 681 P.2d 199, 206 (Utah 1984).[4]
¶ 39 The Utah Supreme Court has held that section 78B-6-121's predecessor, section 78-30-4(3), passed constitutional muster as a matter of facial validity. See, e.g., In re Adoption of Baby Boy Doe, 717 P.2d 686, 689 (Utah 1986) (stating that prior cases have established the facial validity of Utah Code section 78-30-4(3)); see also Wells, 681 P.2d at 207 (holding that the provisions of section 78-30-4(3) for terminating an unwed father's parental rights to a newborn infant are facially valid because the state has a compelling interest in speedy and final custody determinations and the statute is narrowly tailored to achieve that goal). However, the specific provisions of section 78B-6-121 at issue in this case were not present in the prior statute, compare Utah Code Ann. § 78B-6-121(3) (Supp.2009), with Utah Code Ann. § 78-30-4(3) (1987) (requiring only registration with the registrar of vital statistics prior to mother's consent to adopt), and have not been expressly approved by the supreme court.
¶ 40 With the constitutional protection afforded to putative fathers in mind, I turn to my second area of concern. The majority opinion's conclusion affirming the district court relies on the substantive content of Father's affidavit and seems to implicitly adopt a rule that a substantively deficient affidavit filed pursuant to section 78B-6-121(3)(b) may not be corrected by amendment after the birth mother executes her consent to adopt. Such a rule represents a reversal of direction from our recent decision in In re adoption of Baby Boy Doe, 2008 UT App 449, 199 P.3d 368 (mem.), and I am not convinced that a rule disallowing postconsent amendments or other rehabilitative efforts is a prudent one.
¶ 41 In In re adoption of Baby Boy Doe, we stated,
For the purposes of our decision we will assume, without deciding, that (1) a verified petition for determination of paternity qualifies as the statutorily required sworn affidavit; [and] (2) rule 15 of the Utah Rules of Civil Procedure applies to adoption proceedings, thereby permitting amendment of a verified petition for determination of paternity....
*528 Id. ¶ 3. While I recognize the lack of precedential value of this language in light of the court's express disclaimer, I see no reason why such a rule does not represent the more appropriate course of the law in this area.[5] Here, it is undisputed that Father timely filed a proper affidavit in the appropriate court. The only objection was to the substance of the affidavit. While my colleagues and I disagree as to whether the existing substance was sufficient, at the very least the affidavit's language addressed the three core areas of the statute's requirementsfinancial support, custody, and care. It seems to me that Father should be allowed to correct any perceived deficiencies in a timely manner during the ordinary course of the adoption litigation despite the execution of Mother's consent.[6] I cannot say that a prohibition on postconsent amendments is narrowly tailored to promote the compelling interests underlying the statute when providing the opportunity for such timely corrections would seem to fulfill the legitimate interests of the legislature.[7]See generally Wells, 681 P.2d at 207.
¶ 42 Allowing amendment of the substance of a petition after consent would also alleviate a problem that I believe was on full display in this case: sandbagging. Father filed his affidavit in April 2008, while Baby Girl's birth and Mother's consent did not occur until August 2008, some three to four months later. During this period of time, Father's affidavit was available to, and no doubt reviewed by, both Mother's counsel and counsel for the adoptive parents. Any perceived shortcomings in Father's affidavit could easily have been relayed to Father in time for him to amend his affidavit prior to Mother's consent, but of course, such shortcomings were only raised after consent in an attempt to defeat Father's standing. I am not suggesting that opposing counsels' conduct was in any way improperindeed, they appear to have been zealously representing their clients' interests. However, I also do not think the law should reward such behavior by precluding amendment of affidavits to accomplish the strict compliance required by the statute.
¶ 43 Finally, I question the wisdom of a system that demands a putative father's strict compliance with fact-intensive requirements prior to the mother's consent to adopt but allows the question of whether he strictly complied to be debated and decided afterwards, particularly if amendment or other postconsent rehabilitative efforts are not allowed. In my opinion, such a system serves no beneficial purpose and operates only as an opportunity "to divest unmarried biological fathers of the right to raise their children for substantive `technicalities' that have not yet been adequately defined." In re adoption of Baby Boy Doe, 2008 UT App 449, ¶ 9, 199 P.3d 368 (Davis, J., concurring).
¶ 44 I agree with the concurrence in In re adoption of Baby Boy Doe that a strict compliance standard is best reserved for procedural matters such as meeting deadlines, filing documents in the appropriate location, and the signing and notarizing of affidavits. See id. ¶¶ 10-11. In my opinion, requiring strict compliance with section 78B-6-121(3)'s affidavit-content and birth-expense payment requirements, with no opportunity to correct or amend, invites opposing counsel to pursue creative challenges to a putative father's compliance after it is too late for him to do anything about it.
¶ 45 Examples of such creative arguments are not hard to imagine. As pointed out by the concurring opinion in In re adoption of Baby Boy Doe, section 78B-6-121(3)(b)(ii) provides "absolutely no guidance ... as to *529 what, exactly, is a satisfactory `plan[ ] for care of the child.'" See 2008 UT App 449, ¶ 11, 199 P.3d 368 (alteration in original) (Davis, J., concurring). Today's opinion may provide some of that guidance, but there remains an incredibly broad range of potential objections that could be raised against any particular child care plan. Subsections (3)(b)(i) and (3)(b)(iii) of section 78B-6-121 may be somewhat more definite, but I am not sure that even direct quotation of the statute would insulate a father against every challenge. What of the father who agrees to a court order of child support but specifies that such order shall be reasonable, or reserves his right to appeal such order? See generally Utah Code Ann. § 78B-6-121(3)(b)(iii). Or the young father who accepts full custody of the unborn child but makes clear that his own parents will, as a practical matter, share custody of the child? See generally id. § 78B-6-121(3)(b)(i). Perhaps most glaring of all, what attorney could resist the chance to secure victory for his client by establishing, after the fact, that a father's actual preconsent payment of pregnancy expenses was fifty or a hundred dollars too little in light of the father's later-determined "financial ability"? See id. § 78B-6-121(3)(d).
¶ 46 In each of these examples, the putative father has potentially failed to strictly comply with the statute. And yet, I fail to see how the denial of a father's rights based on any of these minor failures, with no opportunity to correct them, represents a rule narrowly tailored to serve any compelling interest. In light of the potential for such arguably unconstitutional results, I think it best to interpret section 78B-6-121(3) either to allow for the postconsent correction of substantive shortcomings or to not require strict compliance for the statute's non-procedural requirements to begin with.
¶ 47 In conclusion, while I concur in certain aspects of the majority opinion, I must dissent from its ultimate conclusion affirming the district court's order. In my view, Father timely and strictly complied with all of section 78B-6-121(3)'s requirements, and I would reverse the district court's order and remand this matter for consideration of Father's objection on its merits. However, even if Father's substantive compliance with 78B-6-121(3) could be deemed deficient in any way, constitutional considerations convince me that either Father's actions should be deemed acceptable as substantial compliance with the statute or Father should be allowed a reasonable opportunity to correct any deficiencies despite Mother's execution of her consent to Baby Girl's adoption.
NOTES
[1] However unforgiving the current Act may appear, it represents a liberalization of the historical approach. From 1898 to 1965, adoption of a child born out of wedlock in Utah required consent of the mother only. See In re Adoption of W., 904 P.2d 1113, 1116-17 (Utah Ct.App.1995).
[2] The dissent expresses concern that "requiring strict compliance with the affidavit-content requirements of section 78B-6-121(3), with no opportunity for a putative father to amend or correct deficiencies in his pleadings and affidavits after a mother's consent to adoption, could very well run afoul of the strong constitutional protections afforded to parental rights." See infra ¶ 37. We do not treat this constitutional issue because it was not properly preserved, framed, or briefed in this case. See Brigham City v. Stuart, 2005 UT 13, ¶ 14, 122 P.3d 506 ("[W]e are resolute in our refusal to take up constitutional issues which have not been properly preserved, framed and briefed...."), rev'd on other grounds, 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). The district court did reject C.C.D.'s offer to file a supplemental affidavit on the question of how he would raise Baby Girl in the event he was deported. But on this issue we agree with C.C.D. that the affidavit he filed strictly complied with the statute. C.C.D. did not seek, and the district court did not deny, the opportunity to amend or supplement his affidavit on any other issue. Most importantly, C.C.D. did not argue below, nor does he argue on appeal, that denial of a putative father's motion to amend his affidavit after the birth mother has consented to adoption would offend due process. Accordingly, we express no opinion on this question.

The constitutional claims that C.C.D. does raise do not bear on our holding. The district court ruled that C.C.D. failed to satisfy subsection (3)(b)(ii), subsection (3)(b)(iii), and subsection (3)(d). C.C.D. contests all three rulings on appeal. Since he is required to comply with all statutory requirements, if he loses any of these three challenges on appeal we must affirm. C.C.D. challenges the district court's subsection (3)(b)(ii) ruling on statutory, due process, and equal protection grounds, and he challenges its subsection (3)(d) ruling on statutory and due process grounds. But he challenges the district court's subsection (3)(b)(iii) ruling on statutory grounds only. Because we reject his statutory challenge, we must affirm, irrespective of the merits of his constitutional challenges to the other subsections, on which we express no opinion.
"Under our jurisprudence, if a case may be resolved on statutory grounds, we are obliged to resist the temptation to render unnecessary advisory opinions about constitutional issues, even if they interest us." Pohl, Inc. v. Webelhuth, 2007 UT App 225, ¶ 20, 164 P.3d 1272 (Orme, J., dissenting) rev'd, 2008 UT 89, 201 P.3d 944; accord Hoyle v. Monson, 606 P.2d 240, 242 (Utah 1980) ("[A] constitutional question is not to be reached if the merits of the case in hand may be fairly determined on other than constitutional issues."); see also Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.").
Our affirmance of the district court on the statutory ground that C.C.D. failed to comply with subsection (3)(b)(iii) disposes of this appeal. We accordingly decline to address C.C.D.'s constitutional claims.
[1] I do agree with the majority that verbatim recitation of the statutory language is not necessary to comply with the statute. I additionally note that when the legislature intends to require the exact repetition of particular language, it knows how to impose such a requirement through the use of quotation marks. See, e.g., Utah Code Ann. § 32A-1-107(1)(p) (Supp.2009) (requiring certain alcohol vendors to "display in a prominent place a sign in large letters stating: `Warning: Driving under the influence of alcohol or drugs is a serious crime that is prosecuted aggressively in Utah.'").
[2] Even if Mother's demand did reinstate the obligation under the statute, I believe that Father's response was reasonable in light of the amount of Mother's demand and the short time frame. I would deem Father in compliance under the circumstances even if Mother's demand reimposed some statutory obligation to actually pay expenses prior to her consent to adopt.
[3] I am not suggesting that Mother's initial refusals forever excuse Father from paying his fair share of expenses relating to Mother's pregnancy if such payments might later be ordered by a court. However, Mother's refusals do preclude a denial of Father's paternal standing on the ground of failure to actually pay expenses prior to Mother's consent to adopt. See Utah Code Ann. § 78B-6-121(3)(d)(iii) (Supp.2009).
[4] It should be noted that this is the highest level of constitutional scrutiny, applicable to the review of laws that, for example, provide for content-based speech restrictions, see, e.g., United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000), or classify on the basis of race, see generally Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).
[5] I see no distinction between a verified petition and an affidavit for purposes of amendment in this context.
[6] As noted by the majority opinion, Father did make a request to the district court to be allowed to supplement his affidavit to address the court's concerns regarding possible deportation. The district court denied Father's request, stating that "the statute says he is supposed to put that in his affidavit, not in a supplemental affidavit." The district court's rejection of Father's request clearly indicated the court's opinion that amendment of Father's affidavit was not an option as to his child care plan or any other required element of his affidavit. Thus, I would not fault Father for failing to seek court permission to correct the other alleged deficiencies presented in this case.
[7] Similarly, so long as a father has made some efforts toward paying a mother's expenses, it would seem that any shortcoming in the amount of actual payment could be "amended" after the fact by timely payment of the shortfall with interest.